William SHARMAN

v.

C. SCHMIDT & SONS, INC.

Civ. A. No. 28968.

United States District Court
E. D. Pennsylvania.

April 5, 1963.

Richman, Price & Jamieson, by James L. Price, Philadelphia, Pa., for plaintiff.

Morgan, Lewis & Bockius, by Thomas A. Masterson, Philadelphia, Pa., for defendant.

WOOD, District Judge.

Plaintiff, William Sharman, hereinafter referred to as "Sharman," is a nationally known professional, amateur athlete and coach. The defendant, C. Schmidt & Sons, Inc., hereinafter referred to as "Schmidt's," is engaged in the business of manufacturing and selling beer and malt beverages. The gist of the Complaint is that there is an unauthorized libel by reason of the use of Sharman's picture in an advertising campaign put on by Schmidt's and that in addition thereto his rights of privacy and publicity were invaded. Trial was to the Court without a jury and we make the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. That at the time of the institution of this action, plaintiff was a citizen of the State of Massachusetts, residing in the City of Needham, and is presently a resident of the State of California, residing in Covina.

2. The defendant is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, having its principal place of business in Philadelphia, Pennsylvania.

3. The defendant is and was at all times relevant hereto the operator of a brewery engaged in the business of manufacturing, advertising, selling and distributing beer and other malt beverages in and throughout the States of Pennsylvania, New Jersey, New York, Delaware, Maryland, Virginia, District of Columbia and in the New England States, except Vermont, New Hampshire and Rhode Island.

4. On or about January 6, 1960 plaintiff was a professional basketball player, playing with a professional team known as "The Boston Celtics."

5. About a year before the occurrence in question, plaintiff retained one John Harkrider, 341 E. 43rd Street, New York, New York, to act as his agent in soliciting professional photographic studios to use Sharman as a model for advertising. Harkrider was then engaged in the business of acting as an agent for male models.

6. Several weeks before January 6, 1960, Sharman, in the company of Harkrider, personally called at a number of commercial photographic studios for the purpose of interesting these studios in the use of Sharman's picture in connection with advertising.

7. One of these studios at which they called was Studio Associates, Inc., where Sharman had test photographs taken.

8. There is no affirmative evidence from which the Court can find as a fact that Sharman or anyone on his behalf made known to anyone at Studio Associates, Inc., of any restrictions on the use of his picture in advertisements for the sale of beer.

9. Sharman's picture together with a number of others were subsequently sent to Ted Bates & Company, an advertising agency, for the purpose of selecting the picture of an individual to be used in conjunction with a campaign which they were putting on for Schmidt's.

10. The representative of Ted Bates & Company selected at least three from a group of pictures which they felt would be desirable and among them was the picture of Sharman later used as more particularly set forth herein.

11. On January 6, 1960, as a result of a telephone call from Harkrider's office, the plaintiff's picture was taken at the photographic studio of Studio Associates, Inc., in New York City, New York, and for such picture Sharman was posed in a red shirt holding a bowling ball and without any particular backdrop and no other props in the picture.

12. At no time during the final sitting did Sharman state to anyone at Studio Associates, Inc. that he was unwilling to have his picture used in connection with a beer advertisement.

13. After the pictures were taken Sharman was given two releases which he read and signed in the presence of Patricia Griffing. He was paid $125.00 for the picture used in the advertisement, the subject of this controversy.

14. At no time during the course of signing these releases did Sharman indicate to anyone at Studio Associates, Inc., or Ted Bates & Company that there was any qualification to the general language of these releases or that he did not intend to be legally bound by the written terms thereof.

15. After Sharman's pictures were taken at Studio Associates on January 6, 1960, they were then sent to Ted Bates & Company. Ted Bates thereafter did the necessary art work and furnished the finished product to the Schmidt Company for approval.

16. Schmidt's advertising manager approved the final art work which had Sharman's face in the bowling ad. Later the beer glass and bottle were engraved on the composite advertisement.

17. Uncontradicted evidence causes us to find as a fact that the representative of the Ted Bates agency did not know that at the time he selected Sharman's picture that he was an athlete of national standing. On the contrary, from the evidence, we must find that his picture was chosen because of the photograph itself and on the basis of their judgment that a person of his features would be most conducive to the advertising campaign which they were promoting.

18. Plaintiff first objected to the defendant's beer advertisement in July of 1960, through his counsel in a letter addressed to the defendant.

19. As a result of the use of the picture in the beer advertisement, he suffered to some extent ridicule and criticism during a few basketball games and, particularly, in the City of Philadelphia.

This subjectively caused him concern and worriment. He was particularly concerned over the possible loss to him of many endorsements in the field of sports and its effect on children and parents. He suffered further anguish by reason of his contemplated future career as a college coach, participation in boys' camps activities and personal appearances before audiences comprised of parents and children.

## DISCUSSION

With the advent of 1960 Schmidt's launched an extensive advertising campaign to sell its beer by outlining "The One Man in Four" who possessed the discerning good taste to purchase its product. For this project they contemplated using rugged, masculine "faces" to illustrate certain athletic recreational backgrounds, such as a skiing scene, a fishing scene, a trapshooting scene and a bowling scene.

Meanwhile, Sharman had been properly attempting to supplement his income by the use of his picture or by endorsements in the advertising field.

As we have found, one of the pictures for which he was paid was used in this campaign. At the time of the taking of the picture Sharman was paid a fee of $125.00 for which he executed two releases, which, inter alia, permitted the use of his picture "distorted in character, or form." [1] The releases also recited that the picture was to be used for

I.

"STUDIO ASSOCIATES
"2 West 37th Street, New York 18,
New York
"Dated Jan. 6, 1960

"MODEL RELEASE

"In consideration of $125.00, receipt whereof is acknowledged, I hereby give STUDIO ASSOCIATES, INC., its legal representatives and assigns, and all persons or corporations acting with its permission or upon its authority, and all persons and corporations for whom STUDIO ASSOCIATES, INC. is acting, the absolute right and unrestricted permission to copyright and/or use, and/or publish photographic portraits or pictures of me, or in which I may be included in whole or in part, or composite or distorted in character, or form, in conjunction with my own or a fictitious name, or reproductions thereof, in color or otherwise, made through any media at their studios or elsewhere for purposes of art, advertising, trade, or any other lawful purpose whatsoever.

＊　＊　＊　＊　＊

"Signed /s/ Bill Sharman (L.S.)
"Address /s/ Harkrider
"Witness /s/ Patricia R. Griffing"

"TED BATES & COMPANY
"Advertising
"630 Fifth Avenue – New York – 20 – N. Y.
"MODEL RELEASE
"Date 1–6–60

"In consideration of $125.00 to me paid, receipt of which is hereby acknowledged, I hereby grant to ＊ ＊ ＊ TED BATES & COMPANY, INC. or those for whom ＊ ＊ ＊ TED BATES & COMPANY, INC. are acting, the absolute right and permission to copyright, and/or use, and/or publish photographic portraits or pictures of me still, single, multiple or moving picture or in which I may be included in whole or in part, or composite, or distorted in character or form, in conjunction with my own or any other name, or reproductions thereof, in color or otherwise, made through any media at its studios or elsewhere, for art, advertising, trade or any other lawful purpose whatsoever.

"I hereby waive any right that I may have to inspect and approve the finished product or the advertising copy that may be used in connection therewith, or the use to which it may be applied.

"I hereby release, discharge and agree to hold harmless ＊ ＊ ＊ TED BATES & COMPANY, INC. their nominees, or others for whom ＊ ＊ ＊ TED BATES & COMPANY, INC. are acting, from any liability by virtue of any use whatsoever, whether intentional or otherwise, that may occur or be produced in the taking of said picture, or in any processing tending towards the completion of the finished product, unless it can be shown that said reproduction was maliciously caused, produced and published solely for the purpose of subjecting me to conspicuous ridicule, scandal, reproach, scorn and indignity.

＊　＊　＊　＊　＊

"Model /s/ Bill Sharman
"Witness /s/ Patricia R. Griffing
"Agency　　Harkrider
"Home　　30 Edgewater Dr.
"Address　Needham, Mass.

＊　＊　＊　＊　＊ "

advertising purposes and gave unrestricted rights to all persons and corporations to use the subject's name in conjunction with his picture. Schmidt's did not use Sharman's name, and we are merely concerned with the use of his picture.

The issue in this case rests solely on the legal interpretation of the releases in conjunction with the facts which we have found above. The only protection reserved to Sharman after execution thereof is contained in the words "unless it can be shown that said reproduction was maliciously caused, produced and published solely for the purpose of subjecting me to conspicuous ridicule, scandal, reproach, scorn and indignity."

It is Sharman's contention that because of his close association with youth activities and his previous youth directed endorsements that the advertising has legally subjected him to conspicuous ridicule and scorn, thereby vitiating his written consent.

We must decide, therefore, as the issues are framed, whether in any event the picture is defamatory in its portrayal of the plaintiff in connection with the beer advertisement and also whether or not such portrayal is a serious and unreasonable invasion of the plaintiff's right of privacy and publicity beyond the terms of his express written consent.

Theorizing in the libel action that Schmidt's through their advertising agency, probably posed him with a bowling ball to disguise his identity as a basketball player but realizing full well that he would be immediately recognized by a large segment of a sports-conscious public because of the reputation which he had achieved, he contends that this constituted a "false prop" and they in fact published his picture under an alias.

■ Be that as it may, we are compelled to conclude that he willingly and voluntarily permitted his picture to be taken for a consideration and executed at that time the aforementioned releases. It is inescapable that he knew his picture was to be used in connection with bowling. Whether he knew that it was to be used in a beer advertisement or a particular type of advertisement may be open to some doubt; but, regardless, it is not controlling in this case.

■ The consent of a plaintiff will avoid liability for any defamation.[2] Such consent negatives the existence of any tort in the first instance. There was initial consent by signing the release and by acquiescence in the taking of his picture with a bowling ball.

Coming to his second cause of action for invasion of his right to privacy, he argues that while he posed for a bowling picture he never consented to the use of the picture to promote the sale of beer. In this connection, he contends that it is detrimental to a professional athlete, and particularly to him and others in a similar status, to be in any way connected with the promotion of the sale of alcoholic beverages, including beer.

■ We find it impossible to come to such a conclusion. It may very well be that Sharman was economically or financially affected by what took place, but it cannot be maintained as a principle of law that for an athlete to be associated with an advertisement for beer involves his right to privacy, particularly where he has given such broad and unequivocal consent to the use performed in this case.

Sharman further contends that although there was consent to the use of the bowling picture the additional use of it in connection with beer and the composite advertising containing his picture, the bowling ball, a beer glass and a bottle, exceeded the authorization of the release.

In support thereof, he cites Russell v. Marboro Books, 18 Misc.2d 166, 183 N.Y. S.2d 8 (1959). In that case a professional female model posed for a photograph to be used for advertising purposes and executed a release of liability. Subsequently, by photographic manipulation, her head was removed from this picture

---

**2.** Prosser on Torts, §§ 18, 95(4) (2d ed. 1955); 53 C.J.S. Libel and Slander § 80.

and placed on the body of another female pictured in bed with an elderly man. The altered picture was used to advertise a vulgar book entitled "Clothes Make the Man" which contained obscene illustrations.

In that case Judge Levy ruled that the picture in its altered form exceeded the consent conferred by the release. He stated at page 27 of 183 N.Y.S.2d:

> " * * * I would hold that the original written consent would not apply and that liability would accrue where the *content* of the picture has been "so changed that it is *substantially* unlike the original. In this aspect of the case, I speak of content of the picture as used, not the *purpose* or extent of its use. If, for instance, Springs had used the original picture for its advertising of bed sheets, without the attendant objectionable writing or references, the fact that the *purpose* of the advertisement was not to interest readers in books would not negate the effect of the release." (Emphasis supplied)

Applying the principles of that case to ours we conclude that Sharman's picture was not substantially altered in content. It remained a bowling picture to which was appended a glass and bottle of beer. These additions supplied the purpose of the picture, namely: to sell beer. Having in mind, as we have previously stated, that Sharman did not restrict the commercial use of his picture before it was published in order to justify his position here he would have to bring himself within the provisions of the release, which we find he cannot do. It was contemplated by all parties concerned that the picture would eventually be used for a commercial purpose. The sale of beer is a commercial purpose and is not such a use as brings the facts of this case within those of the Russell case.

In O'Brien v. Pabst Sales Co., 124 F.2d 167 (5 Cir., 1941), the United States Court of Appeals for the Fifth Circuit had reason to rule on a situation factually similar to the instant case. There, the defendant, Pabst Beer, had used a picture of All-American Quarterback, Davie O'Brien (who subsequently became a star for the Philadelphia Eagles) on a calendar which contained advertisements for its beer. O'Brien had never signed a written release and had never been paid for the use of his picture. He claimed that this use had been an invasion of privacy and defamation. The District Court found that there had been an implied consent to the use of plaintiff's photograph and dismissed the claim. The Court of Appeals in sustaining this dismissal, accepted the reasoning of the lower court in reference to the use of an athlete's picture in connection with an advertisement for beer. The District Court had stated that:

> " * * * the business of making and selling beer is a legitimate and eminently respectable business and people of all walks and views in life, without injury to or reflection upon themselves, drink it, and that any association of O'Brien's picture with a glass of beer could not possibly disgrace or reflect upon or cause him damage." pp. 169, 170.

The present state of the law regarding the right to privacy has been colorfully described by Chief Judge Biggs as being " * * * still that of a haystack in a hurricane." [3]

However unsettled the law, the right to privacy exists in all of the jurisdictions where Schmidt's used Sharman's picture to advertise its beer.[4] Therefore, no conflict of laws question arises in this case regarding the application of the law of the forum.

One universally accepted principle of the right to privacy is that a con-

---

3. Ettore v. Philco Television Broadcasting Corp., 229 F.2d 481, 485, 58 A.L.R.2d 626 (3 Cir., 1956).

4. Prosser, Privacy, 48 Calif.L.R., pp. 386, 387, 388 (1960).

sent to an invasion is a complete defense to the appropriation of a plaintiff's likeness to sell products.[5]

■ In the case at bar, by the execution of the release Sharman conclusively consented to the use of his picture.

■ It has also been held that a celebrity such as Sharman [6] has a limited right to privacy because of his prominence.[7] His actions and life are subject to a legitimate public curiosity.

■ A sports figure can complain when his name or likeness is used to advertise a product [8] but he can recover damages only if he has not consented to such use or the advertising exceeds the consent granted.[9] We hold that the use of his picture in the advertisement did not come within the reservations of the release nor was it an intrusion upon his rights which is outrageous or beyond the limits of common decency, and therefore is not an invasion which warrants relief by this Court.

■■ In respect to the action based on an invasion of his right of publicity, this, too, is a fledgling branch of the tort of invasion of privacy. Public figures in the celebrity category have a valuable property right in their name and image.[10]

Pennsylvania has recognized this right in the case of Hagan v. A. S. Barnes & Co., 137 Legal Intelligencer (July 11, 1957), C. P. Philadelphia County.

In this case, relied upon by the plaintiff, Walter Hagan, the famous golfer, brought suit because his name and picture had been used in a book on famous golfers after he had objected to the same. The Court allowed compensatory damages because there was an unprivileged appropriation of the elements of plaintiff's personality.

Factually, the Hagan case, with which we do not disagree, is inapposite to the instant controversy. There, Mr. Hagan's picture was taken without his knowledge while he was on the golf course. Later, the photographer sent him a letter containing a release and a check for $100.00. The letter requested that Mr. Hagan sign and return the release and permit the use of the pictures in the golf book. Mr. Hagan simply answered by stating: "Are you kidding?" Also he wrote a letter to the publisher informing him that he strenuously objected to any use of these pictures and would not authorize their publication in the golf book. The publisher ignored this obvious refusal of consent and published Walter Hagan's picture. Clearly, this case is basically different from ours since Sharman did consent to the use of his picture for advertising purposes.

We come to the question as to whether Schmidt's "maliciously" caused the picture to be used solely for the purpose of subjecting him to ridicule. From the facts presented to us at the trial, and as stated above, there is a total lack of proof of malice. Sharman contends that having given notice that the continued use of his picture constituted malice per se. It will be recalled that notice was not given until seven months after the picture was originally taken.

The fact that members of the sporting public recognized him in the advertisement does not constitute malice and the continued use of it would not create malice if it were not unlawful to begin with. The defendant spent large sums of money in what they contended

5. Prosser, Privacy, id. note 4, p. 419, and see Jenkins v. Dell Pub. Co., 143 F. Supp. 952 (W.D.Pa.1956), aff'd. 251 F. 2d 447 (3 Cir., 1958) ; Miller v. National Broadcasting Co., 157 F.Supp. 240, 254 (D.C.Del.1957).

6. Most Valuable Player in the National Basketball Association for the year 1955.

7. Prosser, Privacy, supra note 4, pp. 415–418.

8. Jansen v. Hilo Packing Co., 202 Misc. 900, 118 N.Y.S.2d 162 (1952). (Baseball player's face used to sell popcorn.)

9. Russell v. Marboro Books, 18 Misc.2d 166, 183 N.Y.S.2d 8 (1958).

10. Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc., 202 F.2d 866 (2 Cir., 1953) ; also see Nimmer, The Right of Publicity, 19 Law and Contemp.Prob. 203 (1954).

then and contend now was in a lawful manner. To protect their investment by legitimate means of course resulted in the ultimate trial of the case and its disposition here, but that alone is far from a malicious act.

In conclusion, there is no allegation let alone any proof of fraud, accident or mistake which caused Sharman to execute this release and he is therefore bound by its terms.[11] We might add that we do not condone all that took place and in fact we are forced to conclude that some economic advantage was taken of Sharman by his own agent and the agency with which he, on Sharman's behalf, negotiated. This situation is not one for which the law provides redress in this action, even though we conclude that there may have been reprehensible conduct and an unfair advantage taken by the recipients of the picture and the release.

## CONCLUSIONS OF LAW

1. We have jurisdiction of the parties and the subject matter.

2. In executing the releases in favor of Studio Associates, Inc. and Ted Bates & Company and their nominees Sharman entered into a valid and binding contract releasing and discharging Ted Bates & Company and Studio Associates, Inc. and their nominees from any liability by virtue of any reasonable and lawful use of the pictures for which the plaintiff voluntarily posed and was paid for on January 6, 1960.

3. Schmidt's used the pictures of the plaintiff in the "One Man in Four" campaign with the consent of Studio Associates and Ted Bates & Company and defendant, C. Schmidt & Sons, Inc. was the nominee of Ted Bates & Company and Studio Associates at the time the pictures were taken and the releases executed.

4. In executing the releases Sharman released and discharged Schmidt's of and from any liability of any nature whatsoever arising out of or related to the use of Sharman's picture in connection with advertising Schmidt's products.

5. The releases executed by Sharman bar all of the claims which he has asserted in this case. Restatement of Torts, § 892.

6. The use of Sharman's picture by Schmidt's under these circumstances did not libel or defame the plaintiff.

7. The use of plaintiff's picture by the defendant did not violate plaintiff's right to privacy.

8. The use of plaintiff's picture by the defendant under these circumstances did not violate plaintiff's "right of publicity."

9. The verdict is in favor of the defendant on all counts.

## ORDER

And now, this 5th day of April, 1963, judgment is entered in favor of the defendant, C. Schmidt & Sons, Inc., on all counts of the Complaint.

---

11. 31 P.L.E. Release, §§ 6, 31, 37, 38; also see Prosser, Privacy, supra, note 4, p. 419.