Theodore Otto UHLAENDER, also known as "Ted" Uhlaender, on behalf of himself and all other professional league baseball players similarly situated, and Marvin L. Miller, Executive Director of the Major League Baseball Players Association, Plaintiffs,

v.

Keith T. HENRICKSEN and Kent L. Henricksen, individually and d/b/a Nemadji Game Company, also known as Negamco, Defendants.

No. 5-70 Civ. 8.

United States District Court, D. Minnesota, Fifth Division.

Aug. 25, 1970.

---

Robins, Davis & Lyons, by Lawrence Zelle, Minneapolis, Minn., for plaintiffs.

Reavill, Neimeyer, Johnson, Fredin & Killen, by R. B. Reavill, Duluth, Minn., for defendants.

NEVILLE, District Judge.

Presented to the court is the question as to whether some several hundred Major League Baseball Players, appearing in this action by one such individual player and by an unincorporated association of major league baseball players have a proprietary or property interest in their names, sporting activities and accomplishments so as to enable them to enjoin the use thereof for commercial purposes by private entrepreneurs engaged in the manufacture of parlor or table games which employ and use their names and sports accomplishments. Diversity jurisdiction is clear, and no challenge is made as to the sufficiency of the parties plaintiff.

Defendants manufacture and sell games called "Negamco's Major League Baseball" and "Big League Manager Baseball." These employ the names and professional statistical information such as batting, fielding, earned run and other averages of some 500 to 700 major league baseball players, identified by team, uniform number, playing position and otherwise.

Defendants' 1967 advertising contained such statements as:

"SCIENTIFICALLY COMPUTED Players are rated in every phase of baseball play. Each pitcher is different and each batter is different. You manage 520 big time players. Your strategy affects the outcome of every game. This game is Big, Colorful, and True. 220 pitchers and 300 fielders are included.

Can be played solitaire, or leagues of 20 can be formed of neighborhood friends. As coach you call the infield position, coach the base runners, select the line-ups, and make many, many other decisions! With BLM, good managing is needed!"

It is clear to the court that the use of the baseball players' names and statistical information is intended to and does make defendants' games more salable to the public than otherwise would be the case. Counsel for plaintiff Association of Major League Baseball Players, an unincorporated association, testified that the association was formed in 1966 to represent the major league baseball players' common interest and that this association is authorized by all but a handful of major league baseball players to act for them in marketing and licensing the use of group names or for group endorsement purposes. The Association does not represent players in-

sofar as they desire to make or have made individual product or other endorsements. The Association now represents over 850 major league baseball players and to date it has issued some 27 different licensing contracts or agreements for group licenses, including four or five other parlor game manufacturers, calling for payments of 5% of gross sales with a minimum royalty of $2,500 per year. These agreements generated over $400,000 income in 1969 all of which is distributed equally, and not according to prominence or excellence in accomplishments, to the various player members. As far back as January, 1967 the plaintiff association wrote defendants notifying them that they were exploiting a claimed property right and offering to enter into a licensing agreement. Defendants have consistently refused so to do. All agreements contain a "most favored nations clause" binding the association to treat all people in the same class similarly and to make no agreement with one which is any more lenient or different than the agreements made with any others. Since several contracts are now extant, plaintiff association stated it will offer no different one to these defendants.

Two major league baseball players, James L. Kaat and James L. Perry, Jr. testified that they believe and consider their names to have financial value and that they do not and did not consent to the use thereof by defendants without an arrangement for payment of a royalty or fee.

Defendants do not deny that they are using the names as alleged. They assert, however, (1) that there is nothing offensive nor demeaning about the way the names are used, which both witnesses Kaat and Perry acknowledged; (2) that the names and statistics concerning sports achievements used in the game are readily available to anyone at Major League offices on inquiry, are published with some regularity in the newspapers and news media and are thus in the public domain; (3) baseball players seek and are anxious for publicity which defendants' games tend to further; (4) the plaintiff association by insisting on a minimum of $2,500 from each licensee tends "to keep little people out of the business" constituting in some way a conspiracy in violation of the antitrust laws.

The defendants insist upon characterizing this action as one involving an alleged invasion of the right of privacy. The complaint however does not predicate its claim for relief upon any assertion of a right to be let alone. Instead, plaintiffs' claim "misappropriation and use for commercial profit of the names of professional major league baseball players without the payment of royalties." [1] The distinction between these two legal theories is important to the disposition of the case.

Prosser, in Handbook of the Law of Torts, (3d Ed., 1964), Chapter 22, has attempted to organize the voluminous case law on invasion of privacy and appropriation of name or likeness [2] by classifying the decisions according to four specific categories: (1) intrusion upon the plaintiff's physical solitude, (2) public disclosure of private facts, (3) placing the plaintiff in a false light in the public eye, and (4) appropriation for commercial benefit of the plaintiff's name or likeness. "It is evident that these four forms of invasion of privacy are distinct, and based on different elements. It is the failure to recognize this which has been responsible for much of the apparent confusion in the decisions." Prosser, op. cit., pp. 842–43.

Although misappropriation of one's name, likeness or personality for commercial use has been considered as one species of the general tort of invasion of

---

1. Complaint, p. 4, para. 17.

2. The field is plagued by so many confused and discordant decisions that one court compared it to "a haystack in a hurricane." Ettore v. Philco Television Broadcasting Corp., 229 F.2d 481, 485 (3d Cir. 1956).

privacy,[3] many authorities suggest that misappropriation is a distinctly independent tort. The reasoning behind this approach is that Prosser's first three categories involve the incidence of specific personal harm (i. e., injury to feelings), while the fourth is generally considered to involve a pecuniary loss, an interference with *property*. 77 C.J.S. Right of Privacy § 2, p. 400, for instance, limits the tort of "invasion of privacy" to those courses of conduct which produce injury to "feelings and sensibilities of human beings, rather than to * * * property, business, or other pecuniary interests." Likewise, Gordon, in "Right of Property in Name, Likeness, Personality and History", 55 Nw.U.L.Rev. 553 (1960), at 554, distinguishes the right of privacy from property rights as follows:

> "Much of the confusion and conflict in the decisions arose because litigants chose to sue in almost every case for invasion of privacy (premised on injury to feelings), rather than for the appropriation for commercial exploitation of property rights in name, likeness, etc., in situations where injury to feelings had only secondary application."

See also Green, "The Right of Privacy", 27 Ill.L.Rev. 237 (1932), (distinguishing between "harms of defamation" and "harms of appropriation"), Canessa v. J. I. Kislak, Inc., 97 N.J.Super. 327, 235 A.2d 62 (1967). See a lengthy Annotation: "Invasion of Privacy By Use Of Plaintiff's Name or Likeness In Advertising," in 23 A.L.R.3d 865 (1969).[4]

However misappropriation is classified, recent cases illustrate that there may be substantive importance in distinguishing it from torts involving invasion of plaintiff's "right to be let alone." In O'Brien v. Pabst Sales Co., 124 F.2d 167 (5th Cir. 1941), cert. denied 315 U.S. 823, 62 S.Ct. 917, 86 L.Ed. 1220 (1942), a famous football player alleged that the defendant had used his photograph for certain commercial purposes without his consent. The complaint claimed damages for invasion of privacy. While the Court recognized the existence at common law of such an action, it affirmed the trial court's directed verdict for defendant because plaintiff had failed to establish direct injury to his personal feelings. The court went on to state that its decision on that claim would not affect:

> "The right of a person to recover on quantum meruit, for the use of his name in advertising. That was not the case pleaded and attempted to be brought. The case was not for the value of plaintiff's name in advertising a product but for damages by way of injury to him in using his name in advertising beer." 124 F.2d 167, 170.

In Canessa v. J. I. Kislak, Inc., *supra,* plaintiffs sued defendants to recover damages for the unauthorized appropriation by defendant of their pictures, names, and elements of their personalities and private lives in connection with the defendant's republication for com-

---

3. See also, Prosser, "Privacy", 48 Cal.L. Rev. 383 (1960).

4. New York has a statute which creates penal and civil liability for the unauthorized use of anyone's name or likeness "for advertising purposes or for the purposes of trade." N.Y.Sess.Laws 1903, c. 132, §§ 1–2, amended in 1921 as New York Civil Rights Law, McKinney's Consol. Laws, c. 6, §§ 50, 51. This is a *privacy* statute, damages under which are measured by injury to feelings, not by loss of the commercial value of that which has been appropriated. Gautier v. Pro-Football, 278 App.Div. 431, 106 N.Y.S.2d 553 (1951); Wrangell v. C. F. Hathaway Co., 22 A.D.2d 649, 253 N.Y.S.2d 41 (1964); Paulsen v. Personality Posters, Inc., 59 Misc.2d 444, 299 N.Y.S.2d 501 (1968). It would seem to the court, contrary to the suggestions of the defendant, that the effect of the New York privacy statute upon the law of that state is irrelevant to the entirely independent area of misappropriation of name or likeness. The fact that the statute creates a right in public figures to sue *for breach of privacy* does not determine that the common law does or does not allow suit for misappropriation.

mercial purposes of a news article in which they had appeared. The court stated, *inter alia,* "Plaintiffs' names and likenesses belong to them. As such they are property. They are things of value." 235 A.2d 62, 76.

A logical extension of the concept that misappropriation of one's name or public personality is a compensable trespass to property has been the recognition of the so-called "right of publicity." It has been held that the exclusive licensee of the right to exploit a celebrity's name, likeness or personality has a proprietary interest (a "right of publicity"), assignable in gross to the extent permitted under the original licensing agreement with the celebrity. Haelan Laboratories, Inc. v. Topps Chewing Gum, 202 F.2d 866 (2d Cir. 1953), cert. denied 346 U.S. 816, 74 S.Ct. 26, 98 L.Ed. 343 (1953), Noted in 62 Yale L.J. 1123 (1953), 41 Geo.L.J. 583 (1953); Nimmer, "The Right of Publicity", 19 L. & C.Prob. 203 (1954). *Cf.* Cepeda v. Swift & Co., 8 Cir., 415 F.2d 1205 (1969).

Since the authorities recognize a cause of action for misappropriation of a name, likeness or personality that is not dependent upon an invasion of privacy in the technical sense, the only issue before the court is whether the plaintiffs' names and published statistics can be considered property subject to legal protection from unauthorized use.

A history of the successful licensing of such names and statistics by the plaintiff association to other game manufacturers obviously does not establish that plaintiffs have any such legal right. The question is rather a purely objective legal problem to be resolved on the basis of an examination of past case law and its application to the facts of the present case.

In Haelan Laboratories, Inc. v. Topps Chewing Gum, 202 F.2d 866 (2nd Cir. 1953), cert. denied 346 U.S. 816, 74 S.Ct. 26, 98 L.Ed 343 (1953), defendant Topps induced baseball players to grant it a license to distribute picture cards of the players with its product, an act which violated an exclusive licensing agreement

in existence between the plaintiff and the same players for the commercial use of their pictures. In this action between the competing licensees, the dispositive issue was whether this licensed right to use the players' likenesses was a proprietary interest subject to legal protection. In reversing the trial court's dismissal of the complaint for failure to state a claim, the Second Circuit held specifically that "a man has a right in the publicity value of his photograph." 202 F.2d 866, 868.

Sharman v. C. Schmidt & Sons, Inc., 216 F.Supp. 401 (E.D.Pa.1963), involved a suit by a well-known professional basketball player to enjoin the allegedly unauthorized use of his picture in connection with the distribution of defendant's product. The court ruled against plaintiff's claims of defamation and invasion of privacy on the basis of its interpretation of a release executed pursuant to a contract licensing Sharman's photograph to certain agencies, but stated that "a sports figure can complain when his name or likeness is used to advertise a product * * *. Public figures in the celebrity category have a valuable property right in their name and image." 216 F.Supp. 401, 407. Thus, as in O'Brien v. Pabst Sales Co., *supra,* a court ruling against a "public personality" plaintiff who sued on the inappropriate theory expressly recognized that such a person has a property right in the commercial value of his name, likeness, and public personality.

Arnold Palmer, et al. v. Schonhorn Enterprises, Inc., 96 N.J.Super. 72, 232 A.2d 458 (1967), bears a close factual resemblance to the case at bar. In that case, a group of professional golfers sued to enjoin the unauthorized use of their names and so-called "profile sheets" containing certain accurate facts concerning their professional careers by defendant as a component of its "Pro-Am Golf Game." It was clear that the purpose and effect of their use was to enhance the marketability of the product. As in the present case, the defendant argued that "since the information con-

tained in the profiles is readily obtainable public data and available to all, it should not be denied the privilege of reproducing that which is set forth in newspapers, magazine articles and other periodicals." 232 A.2d 458, 460. Following a discussion of cases arising in New Jersey and New York under both common law and applicable statutes, the court concluded that the fact that such information embodying the public personalities of the plaintiff celebrities was voluntarily disclosed through various news media did not extinguish their proprietary interests in their names and statistics. The court found a breach of that right, stating:

"It would therefore seem, from a review of the authorities, that although the publication of biographical data of a well-known figure does not per se constitute an invasion of privacy, the use of that same data for the purpose of capitalizing upon the name by using it in connection with a commercial project other than the dissemination of news or articles or biographies does.

The names of plaintiffs have become internationally famous, undoubtedly by reason of talent as well as hard work in perfecting it. This is probably true in the cases of most so-called celebrities, who have attained national or international recognition in a particular field of art, science, business or other extraordinary ability. They may not all desire to capitalize upon their names in the commercial field, beyond or apart from that in which they have reached their known excellence. However, because they presently do not should not be justification for others to do so because of the void. They may desire to do it later.

Perhaps the basic and underlying theory is that a person has the right to enjoy the fruits of his own industry free from unjustified interference. Louis Kamm, Inc. v: Flink, 113 N.J.L. 582, 175 A. 62, 99 A.L.R. 1 (E. & A. 1934); Sustick v. Slatina, 48 N.J.

Super. 134, 143, 137 A.2d 54 (App. Div. 1957).

It is unfair that one should be permitted to commercialize or exploit or capitalize upon another's name, reputation or accomplishments merely because the owner's accomplishments have been highly publicized."

Finally, in the case of Cepeda v. Swift & Co., 415 F.2d 1205 (8th Cir. 1969), a contract case involving an interpretation of the scope of a baseball player's consent in a licensing agreement permitting the defendant to use his public personality, the Eighth Circuit appears to have recognized (albeit by way of dictum) the principal expressed in *Haelan, O'Brien* and *Sharman, supra:* "Nor is it a matter of dispute that plaintiff has a valuable property right in his name, photograph and image and he may sell these property rights." 415 F.2d 1205, 1206.

A search of applicable case law has produced only one relevant decision at odds with the plaintiff's theory of the law. See Hanna Mfg. Co. v. Hillerich & Bradsby Co., 78 F.2d 763 (5th Cir. 1935), which decision as observed in *Haelan* was followed immediately by adverse comments in 36 Colum.L.Rev. 502 (1936), 49 Harv.L.Rev. 496 (1936), and 45 Yale L.J. 520 (1936), and has been generally ignored in the reported cases since its time.

■ It is this court's view that a celebrity has a legitimate proprietary interest in his public personality. A celebrity must be considered to have invested his years of practice and competition in a public personality which eventually may reach marketable status. That identity, embodied in his name, likeness, statistics and other personal characteristics, is the fruit of his labors and is a type of property.

Defendants' contention has no merit that by the publication in the news media and because of the ready availability to anyone of the names and statistical information concerning the players, such information is in the public domain and

the players thus have waived their rights to relief in this case. Such argument may or may not have some weight against a right of privacy claim, but in an appropriation action such as in the case at bar the names and statistics are valuable only because of their past public disclosure, publicity and circulation. A name is commercially valuable as an endorsement of a product or for use for financial gain only because the public recognizes it and attributes good will and feats of skill or accomplishments of one sort or another to that personality. To hold that such publicity destroys a right to sue for appropriation of a name or likeness would negate any and all causes of action, for only by disclosure and public acceptance does the name of a celebrity have any value at all to make its unauthorized use enjoinable.

It seems clear to the court that a celebrity's property interest in his name and likeness is unique, and therefore there is no serious question as to the propriety of injunctive relief. Defendants have violated plaintiffs' rights by the unauthorized appropriation of their names and statistics for commercial use. The remedy at law, considering particularly the difficulty in determining and measuring damages, past or future, is inadequate.

Defendants have argued that the standard licensing contract currently in use between plaintiff association and its present licensees, to the extent that it includes a specific minimum figure of $2,500 should 5% of gross receipts yield less, indicates an unlawful conspiracy to exclude those potential licensees or "little fellows" who operate on such a small scale that the minimum is prohibitively expensive. This allegation is made not as an affirmative counterclaim in the nature of unfair competition or restraint of trade, but rather by way of the equity defense similar to "unclean hands" or *pari delicto*.

This alleged defense could only be predicated on a violation of Sections 1 or 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. Defendants have presented no evidence to support this contention except the bare fact that four or five different game manufacturers are now under contract to the plaintiff association to pay 5% of their gross receipts or a minimum of $2,500, whichever is the greater, for permission to use the major league baseball players' names and likenesses. This does not establish a conspiracy under the Sherman Act or otherwise to monopolize or to deprive defendants of their right of free competition. No more does a shopping center charging tenants a percentage of gross receipts as rental but with a basic minimum should the percentage rental not equal a set figure discriminate against the "little fellow" whose business is not sufficient to enable him to meet the minimum rent. There is no evidence in this case of any conspiratorial intention to harm defendants and the defense must fail if for no other reason than for lack of any proof of the claimed conspiracy.

By the stipulated facts in this case it appears that defendants' net profit from the sale of the two baseball games was $3,727 in 1969 and is estimated to be $4,300 in the year 1970. Defendants have contracted for advertising, including plans for direct mailing, and are said by their counsel to have on hand an inventory of supplies and some manufactured games. The fall season through December is recognized generally as good marketing period. With these considerations in mind, the court has stayed the effect of its separate injunctive order filed herein until January 1, 1971.