ZACCHINI, APPELLEE, *v.* SCRIPPS-HOWARD BROADCASTING CO., APPELLANT.

[Cite as Zacchini v. Scripps-Howard Broadcasting Co. (1976), 47 Ohio St. 2d 224.]

(No. 75-995—Decided July 28, 1976.)

*Messrs. Spangenberg, Shibley, Traci & Lancione* and *Mr. John G. Lancione*, for appellee.

*Messrs. Baker, Hostetler & Patterson, Mr. Ezra K. Bryan, Mr. Don H. Pace* and *Mr. Lawrence V. Lindberg*, for appellant.

STERN, J. The complaint in this case claimed that "the defendant showed and commercialized the film of * * * [plaintiff's] act without his consent and such conduct by the defendant was unlawful appropriation of plaintiff's professional property." Appropriation is a well-recognized branch of the more general tort of interference with the right of privacy. In *Housh* v. *Peth* (1956), 165 Ohio St. 35,

226

133 N. E. 2d 340, this court affirmed the principle that each individual has a legally protected right of privacy. In paragraph two of the syllabus of that case, the court held that:

"An actionable invasion of the right of privacy is the unwarranted appropriation or exploitation of one's personality, the publicizing of one's private affairs with which the public has no legitimate concern, or the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities."

Appropriation is also recognized as a distinct form of invasion of privacy by the proposed Restatement of Torts, and by a leading commentator. Restatement of Torts 2d (Tentative Draft, No. 21 [1975]), Section 652C; Prosser, Privacy, 48 Calif. L. Rev. 383, 401-07.

The majority of the Court of Appeals, however, found that the recognized forms of invasion of privacy, including appropriation, do not "provide a logically adequate embrace for the wrong the plaintiff claims has been done." The court proceeded to find that a performer's act is property entitled to protection under the common law and held that: "The total appropriation of a performer's act by video-taping and re-showing without the performer's permission is an invasion of a property right which will give rise to a cause of action for damages based either on conversion or the invasion of the performer's common law copyright."

It is the opinion of this court that plaintiff's claim is one for invasion of the right of privacy by appropriation, and should be considered as such. The Court of Appeals raised other issues in this case, sua sponte, and has, in our view, improperly and unwarrantedly disregarded the principles underlying conversion and common law copyright. A few comments on those subjects are therefore in order.

Conversion is a wrongful exercise of dominion over property in exclusion of the right of the owner, or withholding it from his possession under a claim inconsistent with his rights. Railroad Co. v. O'Donnell (1892), 49 Ohio St. 489, 497, 32 N. E. 476. Although the original rule at common

law was that only tangible chattels could be converted, it is now generally held that intangible rights which are customarily merged in or identified with some document may also be converted. Examples include drafts,[1] bank passbooks,[2] and deeds.[3] See Prosser, The Law of Torts (4th ed. 1971), at pages 81-82. See, generally, Annotation, 44 A. L. R. 2d 927. But conversion does not apply to any intangible right, and certainly it has never been held that one's countenance or image is "converted" by being photographed. The difficulties with any such holding are apparent. "Taking" a photograph of someone does not in fact take anything from that person. If the photograph or film is only a conversion when shown to others, we may well ask to how many others it must be shown, and how often, before it becomes actionable. The distinguishing characteristic of conversion is the forced judicial sale of the chattel or right of which the owner has been wrongfully deprived. In the case of such intangible quasi-proprietary rights as are involved here, a forced sale would be largely absurd, because of the doubtfulness of determining what has been "taken." Is it the right to perform the act, to view it, to present it on television, to license its filming, or some other right? Judicial ingenuity could perhaps award damages and find a *res* said to be sold. But to extend the ambit of conversion to rights such as those claimed by plaintiff, which are more appropriately considered under wholly distinct legal principles, is confusing, unnecessary, and improper.

Common law copyright is similar to statutory copyright, in that it recognizes the right of the author or creator of an original literary or artistic work to legal protection of his efforts. It is a right which arises out of the very act of creation. If a work may be copyrighted under the statutes, it will also be protected by common law before it is

---

[1] *Gibsonburg Banking Co.* v. *Wakeman Banking Co.* (1900), 20 C. C. 591, 10 C. D. 754.

[2] *Stebbins* v. *North-Adams Trust Co.* (1922), 243 Mass. 69, 136 N. E. 880.

[3] *Hayes* v. *Massachusetts Mut. Life Ins. Co.* (1888). 125 Ill. 626, 18 N. E. 322.

published or statutorily copyrighted, and the two forms of copyright are closely related, since the common law copyright expires when the protection of statutory copyright is acquired. See 1 Nimmer on Copyright 38-42.1, Section 11.1.

Plaintiff's performance of his act is plainly not a "writing" within any of the statutory classification of works capable of copyright registration. Sections 4, 5, Title 17, U. S. Code. These statutory requirements do not restrict the common law protection for unpublished works, but they do suggest some appropriate limits to the sorts of intellectual property and rights which are properly copyrightable. It has been suggested, for example, that non-tangible oral expression should be protected by the common law, even though these are outside the statute. Cf. *Estate of Hemingway* v. *Random House* (1968), 23 N. Y. 2d 341, 296 N. Y. S. 2d 711 with 1 Nimmer on Copyright, *supra*. The essential purpose of copyrights, to foster and protect literary and artistic expression, might well warrant expansion coverage to such communications. But this plaintiff's performance is safely outside even those bounds of copyright. It is not a literary or artistic expression, nor is it a dramatic composition, nor is it original. To extend common law copyright to protect such spectacles as "human cannonballs," and to employ doubtful logic to hold that public performances do not constitute a publication which would terminate the right, would be to grant a perpetual right against copying, presumably both by other performers or by photographers, which would be even greater than the protection accorded by patents or statutory copyrights. Common law copyright should not be so extended. In short, it has no application to this case.

We proceed, then, to the issues we find to be raised in this case: Did the videotaping and broadcasting over his objection of plaintiff's entire act constitute that form of invasion of privacy referred to as appropriation of a plaintiff's name and likeness and, if so, was the television station privileged to do so?

The concept of a right of privacy was first proposed

in a celebrated law review article by Samuel D. Warren and Louis D. Brandeis in 1890. The Right to Privacy, 4 Harv. L. Rev. 193. Although initially rejected by the New York courts, the right of privacy was soon accepted by many state courts and enacted by statute in other states, including New York. Many of the early cases concerning the right of privacy involved the commercial use of plaintiff's name, picture and likeness for such business purposes as advertising a product, or adding luster to the name of a corporation, and many of these cases arose under statutes which granted a right of privacy based upon appropriation of one's name or face only to exploitation "for advertising purposes or for the purposes of trade." 8 McKinney's Consolidated Laws of New York, Civil Rights, Section 50. See, e. g., Cardy v. Maxwell (Sup. Ct. 1957), 9 Misc. 2d 329, 169 N. Y. S. 2d 547.

In a jurisdiction where the right of privacy is a matter of common law, the courts have not limited the right solely to commercial appropriation, and have, for example, granted an injunction to prevent a woman from wrongly claiming she was the plaintiff's common law wife. (Burns v. Stevens [1926], 236 Mich. 443, 210 N. W. 482); cancelled a birth certificate wrongly naming the plaintiff as father (Vanderbilt v. Mitchell [1907], 72 N. J. Eq. 910, 67 A. 97); enjoined the unauthorized use of a prominent politician's name by a political party (State, ex rel. LaFollette, v. Hinkle [1924], 131 Wash. 86, 229 P. 317); and found actionable the signing of plaintiff's name to a telegram urging the governor to veto a bill (Hinish v. Meier & Frank Co. [1941], 166 Ore. 482, 113 P. 2d 438). The interest which the law protects is that of each individual to the exclusive use of his own identity, and that interest is entitled to protection from misuse whether the misuse is for commercial purposes or otherwise. The commercial use of a person's identity is likely to be more offensive to its subject, and may serve in some cases to distinguish mere incidental use of a person's name and likeness, which is not actionable, from appropriation of the benefits associated with the person's identity, which is. But the fundamental wrong is the appro-

priation for one's self of the benefits of another's name, likeness, or identity, and the wrong is the same whether or not that benefit is pecuniary. The applicable principles are well set out in Restatement of Torts 2d (Tentative Draft No. 13, 1967), Section 652C, and the comments thereto, at pages 108 *et seq.*, portions of which are quoted below.[4]

---

[4]Section 652C "One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy.

"*Comment*:

"*a.* The interest protected by the rule stated in this Section is the interest of the individual in the exclusive use of his own identity, in so far as it is represented by his name or likeness, and in so far as such use may be of benefit to him or to others. Although the protection of his personal feelings against mental distress is an important factor leading to a recognition of the rule, the right created by it is in the nature of a property right, for the exercise of which an exclusive license may be given to a third person, which will entitle such a licensee to maintain an action to protect it. The right of such a third person has sometimes been called a 'right of publicity.'

"*b. How invaded.* The common form of invasion of privacy under the rule here stated is the appropriation and use of the plaintiff's name or likeness to advertise the defendant's business or product, or for some similar commercial purpose. Apart from statute, however, the rule stated is not limited to such commercial appropriations. It applies also where the defendant makes use of the plaintiff's name or likeness for his own purposes and benefit, even though such use is not a commercial one, and even though the benefit sought to be obtained is not a pecuniary one. Statutes in New York, Oklahoma, Utah and Virginia have, however, limited the liability to commercial uses of name or likeness.

"* * *

"*c. Appropriation.* In order that there may be liability under the rule stated in this Section, the defendant must have appropriated to his own use or benefit the reputation, prestige, social or commercial standing, public interest or other values of the plaintiff's name or likeness. It is not enough that the defendant has adopted for himself a name that is the same as that of the plaintiff, so long as he does not pass himself off as the plaintiff, or otherwise seek to obtain for himself the values or benefits of the plaintiff's name or identity. Unless there is such an appropriation, the defendant is free to call himself by any name he likes, whether there be only one person or a thousand others of the same name. Until the value of the name has in some way been appropriated, there is no tort. Compare, as to the use of a personal name as an infringement to the rights connected with

The determinative question is, accordingly, not whether the defendant's taking and use of the films of plaintiff's act was commercial, but, rather, whether that taking and use constituted the appropriation of the defendant's exclusive rights to his own likeness and identity.

It seems, of course, somewhat anomalous for the plaintiff, who regularly performs in public before large crowds, to claim a right of privacy. The very purpose of a performer is to lure people to come watch him, and certainly the plaintiff hoped not for privacy, but for crowds of thrilled spectators. But there is no real anomaly; the "privacy" which the performer seeks is personal control over commercial display and exploitation of his personality and the exercise of his talents. In other words, performers and other public figures wish to keep the benefits of their performances private, or at least to retain control over them, in much the same way that any individual would wish to keep control over his name and face. Judge Jerome N. Frank has aptly called this aspect of privacy "the right of publicity":

"* * * We think that, in addition to and independent of that right of privacy (which in New York derives from

a trade name, the rule stated in Section 722.

"* * *

"d. Incidental use of name or likeness. The value of the plaintiff's name is not appropriated by mere mention of it, or by reference to it in connection with legitimate mention of his public activities; nor is the value of his likeness appropriated when it is published for purposes other than taking advantage of his reputation, prestige, or other value associated with him, for purposes of publicity. No one has the right to object merely because his name, or his appearance, is brought before the public, since neither is in any way a private matter, and both are open to public observation. It is only when the publicity is given for the purpose of appropriating to the defendant's benefit the commercial or other values associated with the name or the likeness that the right of privacy is invaded. The fact that the defendant is engaged in the business of publication, for example of a newspaper, out of which he makes or seeks to make a profit, is not enough to make such incidental publication a commercial use of the name or likeness. Thus a newspaper, although it is not a philanthropic institution, does not become liable under the rule stated in this Section to every person whose name or likeness it publishes."

statute), a man has a right in the publicity value of his photograph, *i. e.*, the right to grant the exclusive privilege of publishing his picture, and that such a grant may validly be made 'in gross,' *i. e.*, without an accompanying transfer of a business or of anything else. Whether it be labelled a 'property' right is immaterial; for here, as often elsewhere, the tag 'property' simply symbolizes the fact that courts enforce a claim which has pecuniary worth.

"This right might be called a 'right of publicity.' For it is common knowledge that many prominent persons (especially actors and ball-players), far from having their feelings bruised through public exposure of their likenesses, would feel sorely deprived if they no longer received money for authorizing advertisements, popularizing their countenances, displayed in newspapers, magazines, busses, trains and subways. This right of publicity would usually yield them no money unless it could be made the subject of an exclusive grant which barred any other advertiser from using their pictures." *Haelan Laboratories, Inc.*, v. *Topps, Chewing Gum, Inc.* (C. A. 2, 1953), 202 F. 2d 866, 868. See, also, *Pittsburgh Athletic Co.* v. *KQV Broadcasting Co.* (1938), 24 F. Supp. 490.

It is this right, a right of exclusive control over the publicity given to his performances, which the plaintiff seeks to protect. For a performer, this right is a valuable part of the benefit which may be attained by his talents and efforts, and we think that this right is entitled to legal protection, contrary to the holding of some earlier cases. See, *e. g., Gautier* v. *Pro-Football* (1952), 304 N. Y. 354, 107 N. E. 2d 485; *O'Brien* v. *Pabst Sales Co.* (C. A. 5, 1942), 124 F. 2d 167.

We may assume that a right of publicity inheres in a performer, at least to the extent that the performer has not abandoned the right by effectively dedicating it to the public in whole or in part, or has failed to give reasonable notice to the public, and we need not consider when the right is abandoned or lost under the facts of this case. We may reasonably assume that the plaintiff's performance of his act in a county fair was not such an abandonment of his

right of publicity that anyone might, over his stated objection and without license or privilege, film the performance and broadcast the film to millions of viewers in the area.

The decisive issue in this case, then, is whether the defendant TV station had a privilege to film and televise the plaintiff's performance, on its nightly news program, and if so whether that privilege was abused.

In *Time, Inc., v. Hill* (1967), 385 U. S. 374, the action was for invasion of the right of privacy under the New York statute, essentially under the category of placing a person in a false light. In that case, the court held, at pages 387-88, "that the constitutional protections for speech and press preclude the application of the New York statute to redress false reports of matters of public interest in the absence of proof that the defendant published the report with knowledge of its falsity or in reckless disregard of the truth." On its face, this holding might be taken to mean that any truthful report which constitutes an invasion of privacy is privileged. In fact, it is not likely that the court meant to go so far. The principle of the case is that freedom of the press inevitably imposes certain limits upon an individual's right of privacy. As the court stated further:

"'* * * Exposure of the self to others in varying degrees is a concomitant of life in a civilized community. The risk of this exposure is an essential incident of life in a society which places a primary value on freedom of speech and of press. 'Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.' *Thornhill* v. *Alabama*, 310 U. S. 88, 102. 'No suggestion can be found in the Constitution that the freedom there guaranteed for speech and the press bears an inverse ratio to the timeliness and importance of the ideas seeking expressions.' *Bridges* v. *California*, 314 U. S. 252, 269. We have no doubt that the subject of the Life article, the opening of a new play linked to an actual incident, is a matter of public interest. 'The line between

the informing and the entertaining is too elusive for the protection of * * * [freedom of the press].' *Winters* v. *New York*, 333 U. S. 507, 510. Erroneous statement is no less inevitable in such a case than in the case of comment upon public affairs, and in both, if innocent or merely negligent, '* * * it must be protected if the freedoms of expression are to have the ''breathing space'' that they ''need * * * to survive'' * * *' *New York Times Co.* v. *Sullivan, supra,* at 271-272. As James Madison said, 'Some degree of abuse is inseparable from the proper use of every thing; and in no instance is this more true than in that of the press.' 4 Elliot's Debates on the Federal Constitution 571 (1876 ed.). * * *''

The effect of this holding, and of that in *New York Times Co.* v. *Sullivan* (1964), 376 U. S. 254, is that the press has a privilege to report matters of legitimate public interest even though such reports might intrude on matters otherwise private. See Restatement of Torts 2d (Tentative Draft No. 13, 1967)⁵ Section 652 F. In cases involving claims of false light, that privilege may be lost by publication of knowing falsehoods, or in reckless disregard of the truth. Just as the press was held to be privileged to report matters which would otherwise be private, if they are of public concern, so too, it must be held privileged when an individual seeks to publicly exploit his talents while keeping the benefits private. The same privilege exists in cases where appropriation of a right of publicity is claimed, and the privilige may properly be said to be lost where the actual intent of the publication is not to give publicity to matters of legitimate public concern.

---

⁵Tentative Draft No. 21, of the Restatement of Torts, modifies Dean Prosser's formulation of the right of privacy somewhat by formulating the issue to be whether the appropriation is an "unreasonable" invasion of privacy, rather than whether it is privileged. However, since the gravamen of the issue in this case is not whether the degree of intrusion is reasonable, but whether First Amendment principles require that the right of privacy give way to the public right to be informed of matters of public interest and concern, the concept of privilege seems the more useful and appropriate one. This approach does not suggest, however, that a claimed appropriation might not be *de minimis.*

No such claim of abuse was made in this case, nor does it appear any could be made. The 15 second film clip of plaintiff's public performance was broadcast a single time on a regular nightly news program. Under the standard articulated by the court in *Time, Inc.*, v. *Hill, supra*, it is clear that a public performance in a county fair is a matter of legitimate public interest, just as the opening of a new play was held to be. Plaintiff argues by implication that the TV broadcast infringed upon his rights because it showed his entire performance, and that such a taking of his whole act, albeit one which only lasts a few seconds, is equivalent to the broadcast of an entire play or the publication, and thus passes the limits of any rights of reporting or fair comment. From the performer's point of view, that position is, of course, understandable, for a film or video tape of a performance comes very close to actually reproducing the performance itself. However, the primary value which one society places upon freedom of speech and of press requires that we reject that viewpoint. The press, if it is to be able to freely report matters of public interest, must be accorded broad latitude in its choice of how much it presents of each story or incident, and of the emphasis to be given to such presentation. No fixed standard which would bar the press from reporting or depicting either an entire occurrence or an entire discrete part of a public performance can be formulated which would not unduly restrict the "breathing room" in reporting which freedom of the press requires. The proper standard must necessarily be whether the matters reported were of public interest, and if so, the press will be liable for appropriation of a performer's right of publicity only if its actual intent was not to report the performance, but, rather, to appropriate the performance for some other private use, or if the actual intent was to injure the performer. It might also be the case that the press would be liable if it recklessly disregarded contract rights existing between the plaintiff and a third person to present the performance to the public, but that question is not presented here.

Here, the TV station was privileged to report the facts of Mr. Zacchini's performance in a newscast, because

the performance was a matter of legitimate public interest. No abuse appears which would defeat that privilege. The judgment of the Court of Appeal is reversed and the judgment of the Court of Common Pleas is reinstated.

*Judgment reversed.*

O'NEILL, C. J., HERBERT, CORRIGAN, W. BROWN and P. BROWN, JJ., concur.

CELEBREZZE, J., concurs in part and dissents in part.

CELEBREZZE, J., concurring in part and dissenting in part. Although I concur in paragraphs one and two of the syllabus of the majority opinion, for the reasons that follow, I must dissent from paragraph three of the syllabus and from the judgment.

The majority opinion properly rejects the theories of conversion and common law copyright adopted, *sua sponte*, by the Court of Appeals as rationale supporting its decision, and, additionally, properly characterizes the instant cause of action as involving the "right of publicity." In this regard, the majority opinion states:

"It is this right, a right of exclusive control over the publicity given to his performances, which the plaintiff seeks to protect. For a performer, this right is a valuable part of the benefit which may be attained by his talents and efforts, and we think that this right is entitled to legal protection * * *."

In applying the above stated principle to the facts of this cause, the majority opinion proclaims that "* * * [w]e may reasonably assume that the plaintiff's performance of his act in a county fair was not such an abandonment of his right of publicity that anyone might, over his stated objection and without license or privilege, film the performance and broadcast the film to millions of viewers in the area."

Yet, the majority opinion concludes that Scripps-Howard Broadcasting Company may do just that, by holding, *as a matter of law*, that a privilege obtains in favor of the media when reporting "matters of legitimate public inter-

est" such that the instant cause of action must be defeated.

For two reasons, I strenuously disagree with the result reached by the majority in this case.

First, the majority's reliance upon *Time, Inc.,* v. *Hill* (1967), 385 U. S. 374, and *New York Times Co.* v. *Sullivan* (1964), 376 U. S. 254, in support of its decision is questionable, at best, and is clearly erroneous, at worst. A significant body of case law has developed subsequent to those decisions that must be recognized in the event the principles elucidated in *New York Times Co.* v. *Sullivan, supra,* and *Time, Inc.,* v. *Hill, supra,* are applied herein. Examination of the relevant decisions is, therefore, appropriate.

In *New York Times Co.* v. *Sullivan, supra,* the Supreme Court of the United States held that before a newspaper may be held liable in damages to a "public official" in a defamation action, it must be established that the publication giving rise to the cause of action was made "with actual malice." The court defined "actual malice" as requiring a plaintiff to prove that the defamatory statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co.* v. *Sullivan, supra* (376 U. S., at page 280). In *Curtis Publishing Co.* v. *Butts* (1967), 388 U. S. 130, the court extended application of the *New York Times* "actual malice" standard to "public figures." In *Rosenbloom* v. *Metromedia, Inc.* (1971), 403 U. S. 29, a plurality of the court further extended application of the *New York Times* standard to actions in defamation brought by private persons whenever the statements allegedly defamatory concerned matters of general or public interest.

However, in *Gertz* v. *Robert Welch, Inc.* (1974), 418 U. S. 323, the court repudiated the plurality opinion in *Rosenbloom,* stating, at page 346, that "extension of the *New York Times* test proposed by the *Rosenbloom* plurality would abridge * * * [a] legitimate state interest to a degree that we find unacceptable."

In *Gertz,* the court held, at page 347, that "* * * so long as they do not impose liability without fault, the states may define for themselves the appropriate standard of lia-

bility for a publisher or broadcaster of defamatory falsehood injurious to a private individual. This approach provides a more equitable boundary between the competing concerns involved here. It recognizes the strength of the legitimate state interest in compensating private individuals for wrongful injury to reputation, yet shields the press and broadcast media from the rigors of strict liability for defamation. * * *'' (Footnote omitted.)

"* * * We endorse this approach in recognition of the strong and legitimate state interest in compensating private individuals for injury to reputation. But this countervailing state interest extends no further than compensation for actual injury. For reasons stated below, we hold that the states may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth. * * *'' *Id.*, at page 348.

The *Gertz* court also established guidelines to be followed by trial courts in considering whether a particular person is a "public figure." In this regard, the court, at page 345, stated:

"* * * For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment."

Recently, in *Time, Inc.*, v. *Firestone* (1976), U. S. , 47 L. Ed. 2d 154, the Supreme Court of the United States reaffirmed its holding in *Gertz* v. *Robert Welch, Inc.*, *supra*.

Examination of the foregoing cases discloses that the Supreme Court of the United States has determined not to apply the strict test enunciated in *New York Times Co.* v. *Sullivan*, *supra* (376 U. S. 254), to defamation actions instituted against the media by private individuals.

The law expressed in *Time, Inc., v. Hill, supra* (385 U. S. 374), must be viewed in light of *Gertz* v. *Robert Welch, Inc., supra*, and *Time, Inc.,* v. *Firestone, supra*.

In *Time, Inc.,* v. *Hill*, the court applied the *New York Times* standard to a "false-light" invasion of privacy action commenced by a private individual. In the next "false-light" case, however, *Cantrell* v. *Forest City Pub. Co.* (1974), 419 U. S. 245, the court, although applying the *New York Times* standard because the trial court had, without objection, instructed the jury upon it with the result that a verdict was obtained against the defendant-publisher, intimated that the *New York Times* standard need not constitutionally be applied in false-light cases brought by private individuals, citing *Gertz* v. *Robert Welch, Inc., supra*.

The implication of the foregoing analysis as applied to the facts of the instant cause is obvious. There is essentially little difference in denominating a cause of action as "false-light invasion of privacy" as opposed to "defamation," because the legal theory utilized to decide both will be the same. In my view, the decision in *Gertz* v. *Robert Welch, Inc.*, will eventually be held to apply to both types of actions. Accordingly, although neither the false-light nor the defamation appellation can accurately be attached to the instant cause of action, for the reason that no falsity is alleged by the plaintiff herein, it appears to me that the principles announced in *Gertz* v. *Robert Welch, Inc., supra*, effectively supersede the rationale upon which *Time, Inc.,* v. *Hill, supra*, was based, and, therefore reliance by the majority upon *Time, Inc.,* v. *Hill* is misplaced.

Consistent with the above, in my view the majority opinion herein falls into serious error by applying the stricter standard of *New York Times Co.* v. *Sullivan, supra*, to the facts of this cause. Additionally, the majority opinion conceivably errs by characterizing the standard to be used, in the first instance, as "whether the matters reported were of public interest," as that standard was rejected in *Gertz* v. *Robert Welch, Inc., supra*, at least in instances where the plaintiff is neither a "public official" nor a "public figure."

240

I have reviewed the foregoing authorities only because of the reliance placed upon *Time, Inc.,* v. *Hill, supra,* and *New York Times Co.* v. *Sullivan, supra,* by the majority. Although the issues presented in false-light invasion of privacy and defamation actions are similar to those presented in the instant. "right of publicity" action insofar as First Amendment rights and privileges of newspaper and broadcast media are concerned, the issues presented herein are distinctly different in all other respects, and require separate analysis.

This is a case of first impression in this state. It basically involves a further review of the principles first enunciated in this state in *Housh* v. *Peth* (1956), 165 Ohio St. 35, wherein the court established that an action may properly be commenced to protect or vindicate a right of privacy.

In the instant cause of action, the plaintiff, Mr. Hugo Zacchini, sought to vindicate the alleged unlawful appropriation of his professional property by the defendant, Scripps-Howard Broadcasting Company.

The facts of this case are simple, and basically uncontradicted. In his complaint, plaintiff alleges "that he is engaged in the entertainment business and that the act which he performs is an act which was invented by his father and has been performed only by his family for the last fifty years." The act to which he refers is colloquially known as the "human cannonball act." In this act, Zacchini is shot out of a cannon into a net approximately 200 feet distant. The entire performance occupies 15 seconds of time.

In August and September, 1972, Zacchini performed his act at the Geauga County Fair, in Burton, Ohio. On or about August 30, 1972, Zacchini requested a free-lance news reporter employed by the defendant not to film his act. However, on September 1, 1972, this reporter did film Zacchini's entire act upon the express order of his superior, the producer of defendant's Eyewitness News Program. The entire act as filmed was broadcast that night on defendant's 11:00 P. M. news program.

Two fundamental questions are presented herein: (1) Whether the above rendition of facts is sufficient to state a cause of action; and (2) if so, whether summary judgment was appropriately granted to the defendant.

The majority opinion concludes that plaintiff stated a cause of action. I agree.

As the majority opinion accurately indicates, plaintiff's cause of action in this case rests upon a claimed infringement of his "right of publicity." This right springs, as illustrated in the majority opinion, from the first form of invasion of privacy described by Dean Prosser in his Handbook of the Law of Torts (4 Ed.), at page 804, as appropriation of the plaintiff's name or likeness. However, this "right of publicity" differs from the other three forms of invasion of privacy characterized by Dean Prosser in that it, unlike the others, generally involves a pecuniary loss, an interference with property. That is because, as in the instant cause, the identity appropriated has an actual or potential commercial value. See, generally, Gordon, Right of Property in Name, Likeness, Personality and History, 55 Nw. U. L. Rev. 553 (1960).

It is now largely beyond dispute that an individual, such as Zacchini, involved in the entertainment or competitive athletic business, has a valuable property right in his or her name, photograph, image and performance, and that this right may be sold. See, e. g., *Motschenbacher* v. *R. J. Reynolds Tobacco Co.* (C. A. 9, 1974), 498 F. 2d 821; *Cepeda* v. *Swift & Co.* (C. A. 8, 1969), 415 F. 2d 1205; *Price* v. *Hal Roach Studios, Inc.* (S. D. N. Y. 1975), 400 F. Supp. 836; *Uhlaender* v. *Henricksen* (D. Minn. 1970), 316 F. Supp. 1277; *Sharman* v. *C. Schmidt & Sons, Inc.* (E. D. Pa. 1963), 216 F. Supp. 401. See, also, *Ettore* v. *Philco Television Broadcasting Corp.* (C. A. 3, 1956), 229 F. 2d 481; *Haelan Laboratories* v. *Topps Chewing Gum* (C. A. 2, 1953), 202 F. 2d 866, certiorari denied, 346 U. S. 816; *Grant* v. *Esquire, Inc.* (S. D. N. Y. 1973), 367 F. Supp. 876; *Canessa* v. *J. I. Kislak, Inc.* (1967), 97 N. J. Super. 327, 235 A. 2d 62; *Hogan* v. *A. S. Barnes & Co.* (C. P. Pa. 1957), 114 U. S. P. Q. 314. The fundamental concept involved in the

"right of publicity" cause of action is the theory that "a person has the right to enjoy the fruits of his own industry free from unjustified interference." *Uhlaender* v. *Henrickson, supra* (316 F. Supp., at page 1282). (Citations omitted.)

Although the majority opinion recognizes the existence of this "right of publicity," it concludes that summary judgment was appropriately granted under the facts of this cause. I disagree.

Civ. R. 56 (C) provides, in pertinent part:

"* * * Summary judgment shall be rendered forthwith if the pleading, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from such evidence or stipulation and only therefrom, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in his favor."

Civ. R. 56 (C) specifically provides that before summary judgment may be granted, it must be determined that: (1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.

As stated recently in *Houk* v. *Ross* (1973), 34 Ohio St. 2d 77, 81: "Civ. R. 56 is virtually identical to the federal rule, FRCP 56, after which it was patterned." The general view of the various federal courts supports the con-

struction of Civ. R. 56(C) rendered herein. See *Ecology Center of Louisiana, Inc.,* v. *Coleman* (C. A. 5, 1975), 515 F. 2d 860; *Tee-Pak, Inc.,* v. *St. Regis Paper Co.* (C. A. 6, 1974), 491 F. 2d 1193; *Caplan* v. *Roberts* (C. A. 9, 1974), 506 F. 2d 1039; *Bloomgarden* v. *Coyer* (C. A. D. C. 1973), 479 F. 2d 201. See, generally, 6 Moore's Federal Practice 56-463 (2 Ed.), Paragraph 56.15(3). See, also, *Joseph* v. *Portsmouth* (1975), 44 Ohio St. 2d 155.

In my view, summary judgment was inappropriately granted by the Court of Common Pleas herein both because there exist genuine issues of material fact and because the defendant is not entitled to judgment as a matter of law.

The following issues of material fact, while not exhaustive, are illustrative of questions not yet resolved in the instant cause:

1. To the extent that *Gertz* v. *Robert Welch, Inc., supra* (418 U. S. 323), is here relevant, whether the plaintiff is a "public figure" as defined in *Gertz?*

2. Whether the plaintiff had contracted to a third party, for remuneration, the exclusive right to exhibit his performance?

3. Whether the plaintiff's contract of employment with the proprietor of the county fair included receipt of a percentage of the paid admissions?

4. Whether the broadcast of his entire act by the defendant, in total disregard of the plaintiff's express request to the contrary, constituted an invasion of the plaintiff's "right of publicity" as established by the majority opinion?

5. Whether the defendant's broadcast of plaintiff's entire performance was influenced by its commercial interests (*i. e.,* ratings)?

In conclusion, since the plaintiff has stated a valid cause of action, since genuine issues of material facts remain unresolved, and since the majority opinion misapplies the relevant law and, therefore, in paragraph three of the syllabus, incorrectly develops the appropriate standard

by which the present appeal should be measured, I must respectfully dissent from paragraph three of the syllabus, and from the judgment rendered herein.

I would affirm the judgment of the Court of Appeals, albeit for different reasons, and remand the cause to the Court of Common Pleas for trial. The effect of such a disposition would not impermissibly expose this defendant to unjustifiable litigation. It would only afford this plaintiff his day in court. Assuming, *arguendo*, that the plaintiff could discharge his burden of proving that the defendant's action economically damaged him, at that time, and in the normal course of law, the defendant could present its defense of the charge. By following this accepted procedure, the Court of Common Pleas, in the first instance, could develop the appropriate legal standard by which the unique circumstances of this cause should be tested.

In my view, a majority of this court has chosen to address and decide the novel and delicate issues of fact and law herein presented upon a woefully inadequate record. It has often been said that "good facts make bad law." However, in this case, a more appropriate cliche is "no facts make no law."