OPINION
{¶ 1} Defendant-appellant Ed Khatib appeals the decision of the Mahoning County Common Pleas Court which adopted a magistrate's decision and entered judgment against him in a conversion action brought by the administrator of the Estate of Hisham Alkhaldi. The issue before this court is whether the elements of conversion were established as appellant claims that the funds he took control over did not belong to the decedent. For the following reasons, the judgment of the trial court is affirmed.
 STATEMENT OF FACTS {¶ 2} Hisham Alkhaldi [hereinafter "the decedent"] and appellant Ed Khatib became friends at college in 1981. Thereafter, the decedent moved back to his home in the United Arab Emirates. After staying in touch over the years, the decedent relocated to Youngstown, Ohio and entered a business agreement with appellant. They owned Consolidated Partners, Inc., doing business as Southside Red and White Supermarket.
 {¶ 3} In 1999, the decedent was ill with cancer. In the fall of 1999, appellant sold his house in Florida and was issued a check for $29,341.59. He and his wife endorsed the check. On November 1, 1999, appellant gave the check to the decedent. Appellant and his wife testified that the money was to be deposited into the business account at First Place Bank for repayment of appellant's home mortgage payments made over the years out of the business account. (Tr. 25, 34).
 {¶ 4} However, the decedent deposited the $29,341.59 check into his personal checking account at Bank One. The decedent died that same day. Appellant notes that he paid the decedent's funeral home bill of $2,393 and the cemetery bill of $1,695 out of the business account.
 {¶ 5} On November 8, 1999, appellant obtained a blank check for the decedent's personal checking account. He wrote this check out to "Cash" for $29,341.59, predated it to November 1, 1999, and forged the decedent's signature as the drawer. He then exchanged this personal check at Bank One for a cashier's check in the same amount and deposited the cashier's check into the business account at First Place Bank. Appellant said the decedent's brother brought him the blank check to use for this purpose, but the brother denies this.
 {¶ 6} Thereafter, appellant called a broker at Dean Witter and asked that a stock account held in the decedent's name be liquidated. It is unknown whether appellant pretended to be the decedent in this phone call, but some testimony from the broker suggests that this would not have been necessary. The broker stated that although the account was in only the decedent's name, he assumed that both appellant and a man named Abrihim Mqasqas also had money in the account since they often called together in conference calls or individually to inquire and make trades. The broker, who was Middle Eastern, and others testified that this was common practice in the Middle Eastern community as were oral agreements and handshakes rather than written contracts.
 {¶ 7} Due to appellant's call, the broker liquidated the account. A check for $17,619.35 was sent in the decedent's name to the decedent's address. Appellant stated that the decedent's brother brought him this check, but again the brother denies this. Appellant endorsed the check. He allegedly deposited the check into the business account, reinvested the money, and eventually lost the money.
 {¶ 8} Abrihim Mqasqas, a Ph.D. in economics, testified that it was his money invested in the decedent's Dean Witter stock account. Mqasqas claimed the decedent allowed him to use his account in order to hide this money from his wife during his divorce. He claimed that all money in the decedent's stock account was his except for 300 shares of a stock worth about $400 that belonged to the decedent. (Tr. 43). He advised that appellant received the money, reinvested it for him in appellant's name with his suggestion as to the stock to buy, but lost the money because Mqasqas failed to pay attention to declining stock prices. (Tr. 41, 57).
 {¶ 9} In January 2000, appellant paid $125,000 for the decedent's share in the business to the decedent's parents, who lived in the U.A.E. The decedent's brother testified that his parents were the only ones to inherit from the decedent. The decedent's parents signed a release of their interest in the business in June 2000. The decedent stated that he belatedly asked for this release because the decedent's brother wrote letters to appellant demanding money. Appellant testified that he believed the release solved all issues such as this one currently in court. He said that he would not have paid the parents that much money if he knew he would later be sued for recovery of $46,960.94.
 PROCEDURAL HISTORY {¶ 10} This suit against appellant was filed on behalf of the decedent's estate by its administrator, John Rasnick. The complaint alleged tortious conversion of the $17,619.35 proceeds from the stock account and the $29,341.59 withdrawal from the decedent's personal checking account.
 {¶ 11} A magistrate heard the matter on March 19, 2003. Post-trial briefs were submitted two months later. Finally, on October 26, 2004, the magistrate issued its decision. The magistrate found that it was undisputed that appellant withdrew money from accounts solely in the decedent's name after the decedent's death. The magistrate also found the evidence presented by appellant to be generally undisputed. The magistrate concluded that there did not appear to be bad faith involved in appellant's "self-help." The magistrate noted that the transactions were performed with knowledge of the decedent's brother, finding the brother's testimony to lack credibility. The magistrate continued:
 {¶ 12} "However, it is not easy to overlook Defendant's forgery of his partner's signature after Hisham M. Alkhaldi's death. The funds obtained through the forgery were clearly held in Hisham M. Alkhaldi's individual name. Any claims for the funds should have been asserted through proper legal proceedings by the proper parties-Consolidated Partners, Inc., the corporate owner of Southside Red White, as to the $29,341.59, and [A]brihim Mqasqas, as to the $17,619.35. Neither the Corporation or Mr. Mqasqas are parties herein."
 {¶ 13} The magistrate noted that the release signed by the decedent's parents only released their interest in the business, not claims against appellant. The magistrate concluded that the estate established by a preponderance of the evidence that upon the decedent's death: the estate was entitled to ownership of the checking account at Bank One and the investment account at Dean Witter; the estate had actual or constructive possession or the immediate right to possession of the accounts; appellant wrongfully interfered with the estate's property rights by his forgery of checks; and the estate was damaged as a result of this conversion. The magistrate recommended that judgment be entered against appellant in the amount of $46,960.94.
 {¶ 14} Appellant filed timely objections to the magistrate's decision. First, he complained about the length of time it took to issue the decision. Then, he claimed that the estate was not damaged because the money did not belong to the estate and because the estate was paid everything that was due and owing to it. He claims he should not have to pay money the estate does not deserve merely to punish him for his misguided acts of "self-help." The estate responded that title to the decedent's funds vested in the estate or its administrator at death and that appellant took funds which the estate had the right to possess.
 {¶ 15} On November 30, 2004, the trial court overruled appellant's objections, stating:
 {¶ 16} "The Defendant's position is more of an equitable rather than a legal one, as there is no authority that the Defendant has cited, nor is there any authority the Court could find, that would permit the Defendant to endorse a check of the Plaintiff and to withdraw the funds from a brokerage account legally titled in Hisham Alkhaldi's name, once Mr. Alkhaldi died."
 {¶ 17} The trial court concluded that appellant's proper recourse would have been to present a claim against the estate for the funds. Thus, the court adopted the magistrate's decision and entered judgment against appellant for $46,960.94. Appellant filed timely notice of appeal.
 LAW ON CONVERSION {¶ 18} "Conversion is a wrongful exercise of dominion over property in exclusion of the right of the owner, or withholding it from his possession under a claim inconsistent with his rights." Zacchini v.Scripps-Howard Broadcasting Co. (1976), 47 Ohio St.2d 224, 226. See, also, State ex rel. Toma v. Corrigan (2001), 92 Ohio St.3d 589, 592. Thus, the elements of a conversion action are: (1) plaintiff's actual or constructive possession or immediate right to possession of the property; (2) defendant's wrongful interference with plaintiff's rights; and (3) damages. Allied Erecting Dismantling Co., Inc. v. Youngstown,151 Ohio App.3d 16, 2002-Ohio-5179, ¶ 76 (7th Dist.), citing TerraceLand Co., Inc. v. Kerrigan (July 28, 2000), 7th Dist. No. 98CA217.
 {¶ 19} Wrongful purpose or intent is not a necessary element; one is liable for conversion even if he acted under a mistaken assumption. Statev. Farm Mut. Auto Ins. Co. v. Loken, 5th Dist. No. 04CA40, 2004-Ohio-5074;Gordon v. Morris (Feb. 2, 2001), 2d Dist. No. 2000-CA-69; Taylor v. FirstNatl. Bank of Cincinnati (1986), 31 Ohio App.3d 49, 52, all citingFulks v. Fulks (1953), 95 Ohio App. 515, 518-519. The motive for conversion is no defense to the action but can be used to defend against punitive damages. Baltimore O.R. Co. v. O'Donnell (1892),49 Ohio St. 489, 501 (where the defendant stalled a gun delivery due to fears of guns' future use in insurrection). Exceptions may exist in cases where the alleged converter was under a duty to protect the public or was acting pursuant to a facially valid court order. See, e.g., Penrod v.Prosecuting Atty. of Scioto Cty. (Apr. 4, 1990), 4th Dist. Nos. 1771, 1818.
 {¶ 20} Both money and checks can be converted. Zacchini,47 Ohio St.2d at 227. The title to personal probate property, such as account balances and checks, of a decedent passes to his executor or administrator pending the settlement of the estate. Toma,92 Ohio St.3d at 592, citing Winters Natl. Bank Trust Co. v. Riffe
(1965), 2 Ohio St.2d 72. As such, one who takes a decedent's checks, forges his name, and withdraws money after his death can be sued for tortious conversion by the administrator of the decedent's estate.
 ASSIGNMENT OF ERROR {¶ 21} Appellant's sole assignment of error provides:
 {¶ 22} "THE TRIAL COURT ABUSED ITS DISCRETION IN RULING THAT KHATIB HAD CONVERTED THE FUNDS IN THE AMOUNT OF $46,960.94 FROM THE ESTATE OF HISHAM M. ALKHALDI SINCE KHATIB HAD AN OWNERSHIP INTEREST IN SAID FUNDS."
 {¶ 23} Appellant splits his argument section into three parts. First, he focuses on the Dean Witter account. He argues that there is undisputed evidence that he had an ownership interest in this account. He claims that one cannot convert what one owns. Initially we note that even a joint owner can convert property by appropriating it for his exclusive use. Rubin v. James B. Neal Co. (Sept. 19, 1989), 10th Dist. No. 88AP-1189, citing Berish v. Berish (1982) 69 Ohio St.2d 318, 319 (where the Supreme Court noted a party's conversion of a joint savings account to his own use).
 {¶ 24} In support of this claim, appellant incorrectly states that there is undisputed evidence that he had an ownership interest in the stock account. In fact, appellant's own witness testified that the decedent owned at least 300 shares of the stock in the account and that he, Abrihim Mqasqas, owned the remainder. He did not testify that appellant owned any of the stock. Moreover, appellant's testimony did not attempt to establish any amount he contributed to the account or amount of entitlement.
 {¶ 25} Furthermore, appellant engaged in wrongful acts in order to obtain funds that became the property of the estate upon the decedent's death. Appellant admitted that he called Dean Witter and ordered liquidation of the decedent's account within weeks of the decedent's death. A check for $17,619.35 was sent in the decedent's name to thedecedent's address. Appellant admitted that he obtained the check from the decedent's mail (whether by way of the decedent's brother or himself was disputed). He concedes he endorsed the check. He states that he then deposited the check into the business account. His witness, Mr. Mqasqas, testified that appellant reinvested the money for him at his direction but the money was eventually lost.
 {¶ 26} For the foregoing reasons, the magistrate and trial court could reasonably find that the administrator proved by a preponderance of the evidence that the administrator had actual, constructive, or the immediate right to possession of the stock account, the later issued check, and the funds derived from that check. The court could also find that appellant wrongfully interfered with those rights of possession and that the estate was damaged as a result of appellant's acts.
 {¶ 27} Whether the money was Mqasqas' is not an issue that could absolve appellant's actions. Appellant had no right to make the decision he did and take the actions he took. When the decedent died, any dispute over the funds in the stock account was between Mqasqas and the estate. Appellant should not have involved himself in that matter. The estate had the right to the possession of the funds at the time of the decedent's death by the fact that they were titled in the decedent's name. A potential contractual or creditor claim that money is owed does not detract from a present right to possess until those claims are adjudicated or settled.
 {¶ 28} Appellant converted the funds and deprived the estate of these funds. Whether he benefited from his actions is irrelevant. See Taylor,31 Ohio App.3d at 525-3. Moreover, his motive is irrelevant for purposes of liability for compensatory damages. See Baltimore,49 Ohio St. at 501. These are not elements required for the tort of conversion. See Allied Erecting, 151 Ohio App.3d at ¶ 76, citing TerraceLand, 7th Dist. No. 98CA217. Moreover, the testimony of Mqasqas need not be considered credible especially where appellant now claims that he owned the stock himself.
 {¶ 29} Next, appellant argues that he did not convert the $29,341.59 withdrawal from the decedent's personal checking account at Bank One. He states that the evidence was undisputed that the money was derived from the sale of his house. He states that the money was to be repaid to their business and not to the decedent personally.
 {¶ 30} To the contrary, there was testimony from the decedent's brother that the check represented payment to the decedent for money owed to him personally. One could question why appellant gave the check to a dying man if it was to be deposited in the business account; in other words why did he not deposit it in the business account himself after showing it to the decedent. We note that appellant mentioned a ledger where the owner's debts to the business were recorded, but he never produced the item or a tally of debts. Nor did he explain how his debt for mortgage payments out of the business exactly totaled the amount of the check payable to him for the sale of his house.
 {¶ 31} Regardless, having a potential claim to funds does not entitle one to obtain a blank check from decedent's checkbook, forge his name as the drawer, write the check out to cash, cash the check, buy a cashier's check, and deposit the cashier's check into the business account, which eventually became the sole property of appellant due to the buy out of the decedent's 50% interest for $125,000. The money was in the decedent's personal checking account. The estate had the right to possession of the account and all funds within it. Appellant obtained a blank check that also was the property of the estate and forged the decedent's name. This act was wrongful and in contravention of the possession rights of the estate.
 {¶ 32} Whether the decedent should have deposited the money in the business account and thus owed the business money is not an issue that will absolve appellant's personal actions. The determination of appellant's intent upon presenting the decedent with the check was not solely for appellant to determine; i.e. whether the check was to pay back the decedent or to pay back the business is not a decision that appellant can unilaterally make by obtaining, forging, and cashing a dead partner's personal check. The estate had a right to possession of money at the time appellant wrongfully pilfered the account. Conversion occurred. Motive and alleged lack of personal benefit are not defenses. As such, the court could reasonably find the elements of conversion were established by a preponderance of the evidence as to the $29,341.59 check.
 {¶ 33} We note that the business is a corporation, and thus, appellant and the corporation are not one and the same just because he is the sole shareholder at this time. And, he was not the sole shareholder at the time of his actions. Further, various parties could have been joined by appellant, and certain counterclaims or cross-claims could have been raised. If the business has a claim for all or part of the $29,341.59 amount, it would be well-advised to seek legal assistance in order to determine whether there is still a way to collect upon it.
 {¶ 34} Lastly, appellant urges that the court abused its discretion in failing to offset the amount of judgment ($46,960.94) by the amount appellant claims to have overpaid the decedent's parents for the decedent's ownership interest in the store. He testified that he paid them $125,000 out of a $150,000 life insurance policy that he and the decedent took out on each other's lives.
 {¶ 35} First, we note that appellant's brief states that the total value of the business was $88,000 and the decedent's 50% was thus only worth $44,000. He then states that he overpaid the parents by $81,000, which he believes should have been offset against the judgment herein.
 {¶ 36} Although page 114 of the transcript cited in appellant's brief may give the impression that the whole business was worth $88,000, appellant later clarified, "his 50 percent was $88,000." (Tr. 128). Thus, his appellate argument for setoff can actually only be for the difference between the $125,000 paid and the claimed $88,000 value of the decedent's share, which equals $33,000 (rather than $81,000).
 {¶ 37} Second, we note that appellant himself stated that $25,000 of the $125,000 payment was earmarked for repayment of a creditor in the U.A.E. who loaned money to the store. (Tr. 114). Although appellant may have meant that only the decedent owed the money and that he used the money to buy into appellant's business, he did not specify this. Thus, one could conclude that appellant only paid the parents $100,000 for the decedent's share, bringing appellant's setoff claim down to only $12,000. He may be implying that his buyout included the presently disputed matters. Yet, $12,000 does not equal any of the disputed amounts; nor does $33,000 for that matter.
 {¶ 38} We can only say that appellant's setoff argument seems to be based upon a claim that the money he took from the decedent's personal account was covered in the sale. However, his argument and rationale on the topic is not clear. In fact, it seems to be something more like, "I was generous enough to pay his parents more than a fair share; now, all amounts over a fair share should be offset because I would not have been so generous if I knew my prior improprieties would come back to haunt me."
 {¶ 39} As the magistrate found, the release signed by the parents (six months after the sale) did not release claims against appellant for forging checks or withdrawing money from the decedent's personal accounts. All the release stated was that the parents release and waive any interest they might have or acquire in the corporation or in the shares of stock in the corporation owned by the decedent when he died. This does not provide evidence that appellant "overpaid" the parents for a release of all claims arising out of his forgeries, withdrawals, and conversions.
 {¶ 40} As aforementioned, there were no counterclaims here. The parties to whom the withdrawn money allegedly belonged were not parties in this suit. This was not a trial where contractual matters were being tried. This was a suit for conversion that was proven by a preponderance of the evidence.
 {¶ 41} For the foregoing reasons, the judgment of the trial court is hereby affirmed.
Donofrio, P.J. and DeGenaro, J., concurs.