WILLIAM SAGL, *d. b. a.* ELECTRIC MOTOR SERVICE, v. EDWARD G. HIRT.[1]

April 4, 1952.

No. 35,620.

*Phillips & Donohue,* for appellant.

*Orville L. Freeman* and *Larson, Loevinger, Lindquist & Freeman,* for respondent.

THOMAS GALLAGHER, JUSTICE.

Action by William Sagl, doing business as Electric Motor Service, as plaintiff, against Edward G. Hirt, defendant, upon an implied contract for the reasonable value of work and labor furnished by plaintiff to defendant in connection with the construction of a laundry building at the Veterans Hospital in St. Cloud. Defendant was contractor for the general construction thereof under an agreement with the United States of America and had sublet the electrical work thereon to plaintiff.

The principal dispute between the parties, both here and at the trial, is whether plaintiff under his subcontract was bound to refill certain trenches which he had excavated for installation of the

required electrical ducts. He insists that, while his contract did not cover this phase of the work, upon defendant's demand he had refilled the trenches with the expectancy that he would be compensated for the reasonable value of the labor furnished in connection therewith.

The trial court, after hearing the evidence, determined that this work was not within the terms of plaintiff's subcontract and that he was entitled to an award against defendant in the sum of $2,759.83, the reasonable value thereof, plus costs and interest from the date of completion of the work. This is an appeal from the judgment subsequently entered for the amounts thus awarded.

Defendant's general contract with the United States was entered into in June 1947. On June 23, 1947, plaintiff submitted to him a proposal in writing under which plaintiff proposed to "do the electrical work for the laundry building as per plans and specifications" for a specified sum. This proposal was accepted by defendant June 26, 1947.

In agreements of this kind the United States does not recognize subcontractors, but looks to the general contractor exclusively for responsibility for performance of the entire project. Sections 1(b) and 1(c) of the specifications, made a part of the general contract, respectively provide:

"(b) All work required in connection with the utility services for work of the project shall be as specifically required under applicable sections of the specifications, such as 'Plumbing', 'Heating', 'Ventilation', 'Electrical Work', 'Laundry Equipment', Etc.

"(c) Except as otherwise specifically noted, all filling, backfilling and grading required by any existing conditions or new construction work shall be performed by the Contractor for general construction."

With reference to the electrical work, the specifications further provide:

"801-3. *Underground Ducts:* * * *

"(a) *Method of Application:* Laid in neatly cut trench uniformly graded 3 inches per 100 feet, minimum, toward manholes.

Top of ducts shall be 24 inches below finished grade (30 inches under roads). Ducts shall be encased in 1:3:6 mix concrete envelope (Type 'B' concrete) with 3 inches (minimum) wall thickness and with pre-cast concrete separator blocks at each joint."

Plaintiff entered upon the performance of his contract and excavated certain trenches so that the electrical ducts might be laid therein in accordance with the specifications. After this work was completed and at a time when the excavated dirt was still alongside the trenches, a conversation between plaintiff and defendant took place as follows:

"Q. And there was a talk with Mr. Hirt then about backfill?

"A. Yes.

\* \* \* \* \*

"Q. What was that talk?

\* \* \* \* \*

"A. Mr. Hirt said I should do the backfill.

\* \* \* \* \*

"Q. What did you say?

"A. I told him I did not have anything to do with the backfill or his job. He says he was going to find out.

\* \* \* \* \*

"Q. When did you next talk with him about the backfilling?

"A. That happened in the summer of 1948, about May or June, something like that.

\* \* \* \* \*

"Q. What was said at that time?

"A. He asked me why I did not proceed with the backfill.

\* \* \* \* \*

"Q. And what did you say?

"A. I told him I am not doing the backfill according to my contract and break-down and specifications.

"Q. And you refused to do it?

"A. Yes.

"Q. And he insisted you do it?

"A.   He told me he was going to take it up with Mr. Nichols and see what could be done.

\*     \*     \*     \*     \*

"Q.   \* \* \* When did you talk with him again?

"A.   Probably a couple of [or] three weeks later, he told me then—

"Q.   What did he say then?

"A.   That I had the laborers that were not doing much and I should proceed with the backfilling.

"Q.   He said you had labor?

"A.   Laborers.

"Q.   That wasn't doing very much and you to go ahead and do the backfill?

"A.   Yes.

\*     \*     \*     \*     \*

"A.   And so I proceeded to backfill.

\*     \*     \*     \*     \*

"Q.   And you say you did go ahead with it?

"A.   I decided to go ahead with it and charge him for it."

On appeal, defendant asserts (1) that under the terms of the written contract and specifications plaintiff was required to refill the trenches; (2) that, if not, then plaintiff's actions in refilling them were those of a volunteer and, as such, could not form the basis for an implied contract; and (3) that the court improperly awarded interest on plaintiff's claim prior to its determination at the trial.

■ We believe that under the specific terms of the general contract and specifications under which plaintiff performed his subcontract no obligation rested upon him to refill the trenches on the project. While under ordinary circumstances a contractor making excavations in the performance of work required under his agreement might be expected to be required to refill them, such is not the case where the written instruments otherwise provide. Here, plaintiff's bid was based upon specific provisions of the general contract and specifications with reference to the labor and material

required to be furnished in connection with the electrical work. As indicated, these provided:

"Except as otherwise specifically noted, all *filling, backfilling and grading* required by *any* existing conditions or new construction work shall be performed by the *Contractor for general construction.*" (Italics supplied.)

In submitting his bid for the electrical work, plaintiff was justified in keeping in mind the foregoing and the further provision that:

"All work required in connection with the utility services * * * shall be as specifically required under applicable sections of the specifications, such as 'Plumbing', 'Heating', 'Ventilation', *'Electrical Work'*, * * *." (Italics supplied.)

The specific reference to the ducts for electrical wiring in § 801-3 of the specifications makes no provision for refilling the trenches required therefor, nor is there any such requirement in any other part of the contractor's specifications. This is particularly significant in view of the fact that the same specifications make provision for refilling in setting forth requirements governing the installation of other utilities on the project. Thus § 1, entitled EARTHWORK, subsections 1-3 and 1-4, set forth the requirements and procedure for backfilling in connection with the completion of the earthwork. Likewise, § 750, relating to OUTSIDE STEAM DISTRIBUTION, subsection 750-6, sets forth specific requirements relating to backfilling after final inspection of the pipe lines.

Plaintiff was entitled to place full reliance upon the definite and unambiguous language of the specifications under which his bid was submitted, and we must conclude that the trial court was correct in holding that thereunder no responsibility rested upon him to refill the excavated trenches. Karger v. Wangerin, 230 Minn. 110, 40 N. W. (2d) 846; Seifert v. Mutual Benefit L. Ins. Co. 203 Minn. 415, 281 N. W. 770; Bone v. New York L. Ins. Co. 165 Minn. 327, 206 N. W. 452.

■ Our previous decisions clearly establish plaintiff's right to recover under an implied contract for the extra labor furnished by him as described. A person performing services not within the terms of the written agreement under which he is operating is entitled to recover the reasonable value thereof under an implied or quasi contract therefor. 6 Dunnell, Dig. & Supp. § 10368; Steele v. City of Ely, 96 Minn. 25, 104 N. W. 566; Fravell v. Nett, 46 Minn. 31, 48 N. W. 446; In re Dunnigan's Estate, 282 Mich. 500, 276 N. W. 532; Miller v. Gray, 205 Iowa 1305, 217 N. W. 228. Nor is it material that in such a situation the principal contractor is of the belief that the extra services required are within the terms of the agreement with his subcontractor. He is presumed to know the terms thereof and the specifications which form a part of it. Likewise, he must be held to be aware that a subcontractor submitting a bid under his general contract would be certain to carefully scrutinize its terms and specifications insofar as they related to the work upon which he was bidding and to place full reliance thereon. It follows that when defendant instructed plaintiff to proceed to perform work not provided for in the subcontract an implied or quasi contract was thereby created, under which defendant became responsible for the reasonable value of the labor thus ordered. 3 Corbin, Contracts, § 564, p. 174.

■ Defendant asserts that plaintiff was acting as a volunteer in rendering the services in dispute and, as such, is not entitled to recover under an implied contract, citing Dusenka v. Dusenka, 221 Minn. 234, 21 N. W. (2d) 528; Braun v. Hamack, 206 Minn. 572, 289 N. W. 553, 129 A. L. R. 618; Johnson v. Unorganized School Dist. 159 Minn. 226, 198 N. W. 463; Keough v. Wendelschafer, 73 Minn. 352, 76 N. W. 46, in support of this condition. We do not find that the cited cases are applicable here. Thus, in the Dusenka and Johnson cases, the disputed services were furnished without any demand or request therefor; in the Braun case, plaintiff by his own conduct had created a situation which required that he furnish extra services to prevent injury to others; while in the Keough case the court held that the law will not imply a promise to pay a

public official for extra services mistakenly performed by him as part of his official duties.

Here, where the work ordered by defendant was not required under the terms of the specifications and was directed to be performed by plaintiff in the face of such knowledge, it can scarcely be held that plaintiff in complying with the demand of defendant was acting only as a volunteer.

■ Defendant asserts that the allowance of $222.93 interest is not justified by the evidence. From time to time, between June 1947 and March 31, 1949, various phases of plaintiff's work were completed, accepted, and certified as satisfactory by the government and statements therefor promptly presented to defendant. Defendant, however, withheld payment of these various statements, and the court determined that plaintiff was entitled to additional interest on 90 percent thereof from 30 days after their presentation to defendant up to the date of completion of the entire contract on March 31, 1949, amounting to $222.93.

Plaintiff testified that subsequent to the written contract with defendant it was agreed between them that plaintiff should be paid "according to percentage allowed by the superintendent of construction monthly." Article 16(a) and (b) of the general contract between the United States of America and defendant provides:

"(a) * * * partial payments will be made as the work progresses at the end of each calendar month, * * *.

"(b) In making such partial payments there shall be retained 10 percent on the estimated amount until final completion and acceptance of all work covered by the contract: * * *."

It is apparent from these sections that defendant became entitled to receive from the government 90 percent of the amounts owing to plaintiff which had been accepted and certified as satisfactory by the government. In turn, defendant became obligated to make payment to plaintiff as he received such payments from the government.

Plaintiff testified that after completion of his work on April 4, 1949, he submitted a final statement to defendant and included therein $222.93 for interest at six percent on 90 percent of the various items on which he had previously submitted statements, computing interest thereon from 30 days subsequent to the date of their submission to defendant. In his testimony, he made repeated references to this final statement, the original of which was in defendant's possession. It was marked exhibit F and offered in evidence. No objection was made to its admission, and presumably it was received as an exhibit, although the record does not show the court's action on the offer. With respect to the claim for interest, plaintiff testified:

"Q. * * * referring * * * to the itemization of April 4, there is included on that itemization a figure entitled interest charge on 90% of completed work and not paid for work to March 31, 1949?
"A. Yes.
"Q. What is the interest on the sheet at that point?
"A. The interest, the amount?
"Q. Yes.
"A. $222.93.
"Q. Would you explain how you arrived at that figure?
"A. We took those items which were not paid for at this date and thirty days after Mr. Hirt had received a bill, from that date we computed the interest until April 4, 1949."

He further testified:

"Q. In regard to the specific items that were inspected by the superintendent of construction, what was your agreement as to time of payment?
              *    *    *    *    *
"A. I was to get paid for it in a reasonable length of time after I presented my invoice which as a rule is ten days.
              *    *    *    *    *

"Q. Will you relate the conversations and the agreements reached by means of those conversations?

\* \* \* \* \*

"A. Mr. Hirt told me that when the monthly estimates were going in approved I was going to get my money.

"Q. Was there ever any conversations relating to you not receiving payment until Mr. Hirt's work was all cleared and paid for?

"A. No.

"Mr. Sherwood [counsel for defendant] : That is conceded, there is no such claim."

Defendant introduced no evidence to refute plaintiff's computation which he had in his possession or to establish that it was inaccurate or that the oral agreement governing payments as testified to by plaintiff was inaccurate or not in accordance with his understanding thereof. It would seem, therefore, that the trial court's finding as to interest has reasonable support and hence should be sustained.

Affirmed.