65 F.3d 725
 Jesse VENTURA, doing business as Jesse "The Body" Ventura,
also known as James G. Janos, Appellee,
v.
TITAN SPORTS, INC., a Delaware Corporation, doing business
as Titan Sports Enterprises, doing business as
World Wrestling Federation, doing
business as The WWF, Appellant,
A & H Video Sales Representatives, Inc., a New York
Corporation, doing business as Coliseum Video; LJN Toys,
Ltd., a New York Corporation; Putnam Publishing Group, and
its Division Perigee Books, also known as Putnam Berkley
Group, Inc.; Columbia House, a Foreign Corporation, Defendants.
Jesse VENTURA, doing business as Jesse "The Body" Ventura,
also known as James G. Janos, Appellant,
v.
TITAN SPORTS, doing business as Titan Sports Enterprises,
doing business as World Wrestling Federation,
doing business as The WWF, Inc., a
Delaware Corporation, Appellee,
A & H Video Sales Representatives, doing business as
Coliseum Video, Inc., a New York Corporation; LJN Toys,
Ltd., a New York Corporation; Putnam Publishing Group, also
known as Putnam Berkley Group, Inc., and its Division
Perigee Books; Columbia House, a Foreign Corporation, Defendants.
 Nos. 94-3103, 94-3235.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 16, 1995.
Decided Sept. 11, 1995.
Rehearing and Suggestion for Rehearing En Banc Denied Oct. 26, 1995.
 
 Jerry S. McDevitt, Pittsburgh, PA, argued (Mark Ginder, Minneapolis, MN, on the brief), for appellant.
 Alan C. Eidsness, Minneapolis, MN, argued (David B. Olsen, on the brief), for appellee.
 Before MAGILL, Circuit Judge, JOHN R. GIBSON, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.
 MAGILL, Circuit Judge.
 
 
 1
 This appeal arises out of a match between wrestler/commentator Jesse "The Body" Ventura and Titan Sports, Inc., which operates "The World Wrestling Federation" (WWF). Titan appeals the district court's judgment in favor of Ventura, arguing that (1) Ventura was not entitled to recovery under quantum meruit because an express contract covers the subject matter for which Ventura sought recovery; and (2) the district court erroneously admitted and relied upon the testimony of Ventura's damages expert. Ventura cross-appeals the district court's denial of prefiling interest. We affirm in all respects.[1]
 
 I. BACKGROUND
 
 2
 During July 1984, Titan entered into a licensing agreement with LJN Toys authorizing LJN Toys to manufacture dolls using the images of WWF wrestlers. Titan also entered a "master licensing" agreement with DIC Enterprises that resulted in WWF T-shirts, trading cards, calendars, a computer game and numerous other items. In December 1984, Titan entered into a licensing agreement with A & H Video Sales (d/b/a Coliseum Video) for the production of videotapes of WWF matches. Agreements with A & H and Columbia House resulted in the production of approximately ninety videotapes of WWF performances involving Ventura.
 
 
 3
 Ventura began wrestling for Titan in Spring 1984 under an oral contract with Vincent K. McMahon, Titan's President and sole shareholder. In late 1984, Ventura suffered medical problems and ceased to work as a wrestler, although Titan continued to pay him during his convalescence. After Ventura recovered, he returned to work for Titan as a "color" or "heel"[2] commentator under an oral agreement with Titan. He was paid a flat rate of $1000 per week and there was no discussion of videotape royalties or licenses. Shortly after returning to work for Titan, Ventura executed a "Wrestling Booking Agreement" (WBA) with an effective date of January 1, 1985. Ventura subsequently resumed wrestling for Titan, for which he was paid according to the terms of the WBA. In March 1986, Ventura terminated his relationship with Titan in order to pursue an acting career.
 
 
 4
 Ventura's foray into movies was moderately successful, but in fall 1986 he returned to Titan as a commentator, again under an oral agreement that made no mention of videotape royalties or licenses. In fall 1987, Ventura hired Barry Bloom as his talent agent. Bloom negotiated on Ventura's behalf with Dick Ebersol, Titan's partner in producing the "Saturday Night's Main Event" show. However, the negotiations quickly broke down, and as a result, the first show of the 1987-88 season aired without Ventura. A few weeks later, Titan's Vice-President of Business Affairs, Dick Glover, contacted Bloom concerning Ventura and represented to Bloom that Titan's policy was to pay royalties only to "feature" performers. Because Ventura was interested in working for Titan, Bloom thought it wise not to attempt to "break the policy." Ventura returned to work for Titan under a new contract that waived royalties and continued to work as a commentator for Titan until August 1990. Since that time he has worked as a commentator for WCW, Titan's main competitor.
 
 
 5
 In December 1991, Ventura filed an action in Minnesota state court seeking royalties for the use of his likeness on videotapes produced by Titan. The original complaint contained causes of action for fraud,[3] misappropriation of publicity rights and quantum meruit. Titan removed the case to federal court, and the case was tried before a jury. Although only the quantum meruit claim was submitted to the jury, the jury was given a special verdict form concerning misrepresentation. Using this form, the jury found that Titan had defrauded Ventura and that $801,333.06 would compensate Ventura for Titan's videotape exploitation of his commentary. The jury also determined that Titan exploited Ventura's name, voice or likeness as a commentator in other merchandise and concluded that $8,625.60 would compensate Ventura for this exploitation.
 
 
 6
 After the jury rendered its verdict, the district court concluded that Ventura was not entitled to a jury trial on his quantum meruit claim. Accordingly, the court vacated the jury verdict and entered findings of fact and conclusions of law that were consistent with the verdict. The court denied Ventura's request for prefiling interest but granted prejudgment interest from the time the suit was filed. Titan appealed, and Ventura cross-appealed the denial of prefiling interest.
 
 II. DISCUSSION
 
 7
 Titan raises three claimed errors on appeal. First, Titan argues that Ventura was not entitled to quantum meruit recovery of royalties for the videotape[4] exploitation of his performance as color commentator during the 1985-87 (pre-Bloom) period because Ventura provided his commentating services under an express contract. Second, Titan claims that the district court erroneously applied the law of quantum meruit when it rescinded an express contract and awarded Ventura royalties for the videotape exploitation of his performance as color commentator during the 1987-90 (post-Bloom) period. Third, Titan alleges that the district court abused its discretion in qualifying and relying upon Ventura's expert witness in awarding damages. Ventura's cross-appeal presents a single issue: whether the district court clearly erred when it denied Ventura's request for prefiling interest. We address each of these issues in turn.
 
 
 8
 A. Is quantum meruit available during the pre-Bloom period?
 
 
 9
 Minnesota law determines the rights of the parties in this diversity action, and we review the district court's interpretation of Minnesota law de novo. Salve Regina College v. Russell, 499 U.S. 225, 231, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991). The basic contours of the law of quantum meruit, or unjust enrichment, are well settled under Minnesota law:
 
 
 10
 An action for unjust enrichment may be based on failure of consideration, fraud, mistake, and situations where it would be morally wrong for one party to enrich himself at the expense of another. However, a claim of unjust enrichment does not lie simply because one party benefits from the efforts or obligations of others, but instead lies where one party was unjustly enriched in the sense that the term 'unjustly' could mean illegally or unlawfully.
 
 
 11
 Hesselgrave v. Harrison, 435 N.W.2d 861, 863-64 (Minn.App.1989) (internal quotations and citation omitted). Although the applicable law is well settled, the facts of this case are rather unique and therefore require us to address some preliminary issues.
 
 
 12
 The first unique aspect of this appeal involves defining the benefit received (allegedly unjustly) by Titan. Titan makes much of the fact that Ventura provided no services for Titan other than pursuant to the Ventura-Titan contracts. While it is true that the Ventura-Titan contracts governed all the services provided by Ventura (i.e., his acts of appearing at the wrestling match and commentating), the agreements do not necessarily address all the benefits created by Ventura's services. Ventura's services created several varieties of intellectual property rights. In defining the "benefit" conferred upon Titan, the proper focus is not merely Ventura's labor as he performed, but must also include the intellectual property rights created by Ventura's performance. Thus, we find that the intellectual property rights to Ventura's commentary are benefits upon which an action for unjust enrichment may be based.
 
 
 13
 We next must determine whether Titan, in taking this benefit, was unjustly enriched. Ventura's quantum meruit claim may succeed only if Titan's rights to use Ventura's performance are limited so that Titan is not entitled to use the performance without Ventura's consent. We believe that Titan's rights are limited by Ventura's right to publicity. In determining the law of the State of Minnesota concerning publicity rights, we are bound by the decisions of the Minnesota Supreme Court. If the Minnesota Supreme Court has not addressed the issue, we must determine what that court would probably hold were it to decide the issue. The parties have identified, and we have discovered, no case in which the Minnesota Supreme Court has either accepted or rejected the tort of misappropriation of publicity rights. We must therefore attempt to predict the decision of the Minnesota Supreme Court.[5] In making our prediction, we may consider relevant state precedent, analogous decisions, considered dicta, scholarly works and any other reliable data. B.B. v. Continental Ins. Co., 8 F.3d 1288, 1291 (8th Cir.1993).
 
 
 14
 We believe that the Minnesota Supreme Court would recognize the tort of violation of publicity rights. We are aware that Minnesota does not recognize the fourfold tort of invasion of privacy. See Hendry v. Conner, 303 Minn. 317, 226 N.W.2d 921, 923 (1975); Stubbs v. North Memorial Medical Center, 448 N.W.2d 78, 80-81 (Minn.App.1989). However, the right of publicity differs substantially from the right to privacy. Uhlaender v. Henricksen, 316 F.Supp. 1277, 1280-81 (D.Minn.1970); 2 Fowler V. Harper et al, The Law of Torts Sec. 9.7, at 657 (1986). The policy underlying the tort of invasion of privacy is the protection of the privacy and solicitude of private personae from the mental distress that accompanies undesired publicity. Uhlaender, 316 F.Supp. at 1280. Minnesota courts have refused to adopt this policy on their own initiative. Stubbs, 448 N.W.2d at 81. However, the policy underlying the right to publicity is different in several important respects. The right to publicity protects the ability of public personae to control the types of publicity that they receive. The right to publicity protects pecuniary, not emotional, interests. Uhlaender, 316 F.Supp. at 1280-81. As such, the policy underlying the right to publicity is more akin to the policy underlying the protection of trade names, which Minnesota recognizes. See Minn.Stat. Sec. 325D.165 (Supp.1995) (1994 Amendment to Minnesota Unlawful Trade Practices Act); Sec. 325D.44 (Supp.1995) (Minnesota version of Uniform Deceptive Trade Practices Act). Indeed, the district court for the District of Minnesota has twice relied upon this distinction to recognize the right to publicity. Uhlaender, 316 F.Supp. at 1280-81 (distinguishing misappropriation from right of privacy); McFarland v. E & K Corp., 18 U.S.P.Q.2d (BNA) 1246, 1247, 1991 WL 13728 (D.Minn.1991) (quoting Uhlaender, 316 F.Supp. at 1281-82). Thus, we believe that the Minnesota courts would recognize the right to publicity, and Titan's violation of this right makes Titan's use of Ventura's commentary without his consent unjust.[6]
 
 
 15
 However, quantum meruit is not available simply because Titan may have been unjustly enriched. Minnesota law is clear that "[w]here an express contract exists, there can be no implied [in law] contract with respect to the same subject matter." Reese Design v. I-94 Highway 61 Eastview Center Partnership, 428 N.W.2d 441, 446 (Minn.App.1988); accord Sharp v. Laubersheimer, 347 N.W.2d 268, 271 (Minn.1984). On the other hand, if an existing contract does not address the benefit for which recovery is sought, quantum meruit is available regarding those items about which the contract is silent. Holman v. CPT Corp., 457 N.W.2d 740, 745 (Minn.App.1990); Frankson v. Design Space Int'l, 394 N.W.2d 140, 145 (Minn.1986); Sagl v. Hirt, 236 Minn. 281, 52 N.W.2d 721, 725 (1952).[7]
 
 
 16
 Between 1985 and 1987, Ventura performed services for Titan under two different agreements. Ventura's services as a wrestler are governed by the WBA; his services as a commentator are governed by his oral agreements with McMahon. Thus, two contracts existed between Ventura and Titan between 1985 and March 1986, when the WBA was terminated. Whether quantum meruit recovery was proper depends upon whether or not the two agreements between Ventura and Titan were of limited scope, addressing only televised live performances, or also included subsequent videotape releases of the performances. The district court found that the WBA precluded royalties for the videotape exploitation of Ventura's performance as a wrestler. The district court also found that Ventura and Titan had no agreement concerning the payment of royalties for videotape exploitation of Ventura's performance as a commentator. This finding concerns the intent of the parties, Cepeda v. Swift & Co., 415 F.2d 1205, 1207-08 (8th Cir.1969), and as such, is a factual finding which we review only for clear error. 1 Steven A. Childress & Martha S. Davis, Federal Standards of Review Sec. 2.23 (2d ed. 1991) ("The clearly erroneous rule generally applies to a finding regarding the intent of the contracting parties, at least where the contract is ambiguous.").
 
 
 17
 We have reviewed the record, and are left with no definite and firm conviction that a mistake has been made. From 1985 to 1987, there was no discussion of Titan's right to use Ventura's color commentary. At least initially,[8] Ventura was not aware of the impending videotape sales, as merchandising was not part of the industry practice. These facts support the conclusion that Ventura's contract for commentating services did not contemplate a license for videotape distribution. Accordingly, we hold that the district court's finding that the pre-Bloom Ventura-Titan contracts did not address videotape licenses or royalties is not clearly erroneous. See Anderson v. Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). We believe that the judgment of the district court was correct insofar as it awarded damages for the exploitation of Ventura's pre-Bloom commentating performances.
 
 
 18
 B. Is quantum meruit available for the post-Bloom period?
 
 
 19
 The post-Bloom contracts pose different issues. It is clear that Ventura performed commentating services between 1987 and 1990 pursuant to a series of contracts with Titan. It is also clear that the post-Bloom Ventura-Titan contracts included an arrangement concerning videotape royalties. Bloom specifically inquired about royalties and was told of the Titan policy. In reliance upon this purported policy, Ventura waived his rights to royalties. Titan contends that Ventura is not entitled to recovery in quantum meruit for the post-Bloom period because of the existence of express contracts waiving royalties. See Sharp, 347 N.W.2d at 271 (" 'It is fundamental that proof of an express contract precludes recovery in quantum meruit.' " (quoting Breza v. Thaldorf, 276 Minn. 180, 149 N.W.2d 276 (Minn.1967))). Thus, the question reduces to whether Ventura may avoid the express contract waiving royalties and recover these royalties under quantum meruit. We believe that the district court correctly concluded that Ventura was entitled to avoid the fraudulently induced contracts and to recover the reasonable value of the royalties.
 
 
 20
 We address two issues. First, we decide whether Ventura is entitled to introduce evidence of fraud when his only cause of action at trial was quantum meruit. Second, we address Titan's challenge to the sufficiency of the evidence concerning fraudulent inducement.
 
 
 21
 We believe that Ventura is entitled to introduce evidence of fraudulent inducement, despite the fact that this fraud theory was not pleaded. In ruling on pretrial motions, the district court granted Titan's motion to exclude evidence concerning Titan's fraudulent misrepresentation of its royalty policy as proof of Ventura's fraud theory because Ventura had failed to plead Titan's fraudulent misrepresentations of its royalty policy with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. Add. at 34-35. Although there was some confusion as to whether Ventura's pleaded fraud claim (i.e., Titan's misrepresentations concerning its marketing plans for Ventura's commentaries) survived the district court's ruling, it is clear that Ventura abandoned all fraud claims before trial. App. at 53-57. The district court denied Titan's motion to strike Ventura's quantum meruit claim and held that Ventura could present his quantum meruit theory provided that he presented credible evidence of fraudulent inducement. Add. at 37. Titan's Sixth and/or Seventh Defenses in its Answer to Ventura's Second Amended Complaint raise a "covered by contract" defense to Ventura's quantum meruit claim. Because Ventura had no opportunity to file a responsive pleading, Federal Rule of Civil Procedure 8(d) deems Titan's "covered by contract" defense to be denied or avoided (i.e., it permits Ventura to raise the fraudulent inducement issue although it was not pleaded). Fraud is only in the case because of this "covered by contract" defense. This fraud rescinded or set aside the contract, opening the door to his quantum meruit claim. Thus, we conclude that Ventura was entitled to introduce evidence of fraudulent inducement to avoid this defense.
 
 
 22
 Ventura clearly pursued only the rescission to eliminate the contract and open the door to quantum meruit before trial. On the first day of trial, as preliminary matters were being decided, counsel representing Ventura stated unequivocally that "[w]e are not presenting any claim of misrepresentation or fraud in a separate cause of action." App. at 57. Ventura's counsel continued, making it clear that the only relevance of misrepresentation was to open the door to quantum meruit.
 
 
 23
 Thus, we conclude that the district court properly permitted Ventura to rescind the contract and recover in quantum meruit by proving fraudulent inducement to avoid Titan's "covered by contract" defense. We believe that Ventura's options were quite similar to those of the plaintiff in Stark v. Magnuson, 212 Minn. 167, 2 N.W.2d 814 (1942).[9] In Stark, the defendant breached a contract with the plaintiff, and the plaintiff disaffirmed the contract and sought quasi-contractual recovery. The court approved of such a course of action. Id., 2 N.W.2d at 815. We turn now to the issue whether Ventura actually proved the fraudulent inducement upon which his quantum meruit claim depends.
 
 
 24
 It is well established under Minnesota law that unjust enrichment and quantum meruit may arise from fraud or several other predicates. See, e.g., Holman, 457 N.W.2d at 745; Hesselgrave, 435 N.W.2d at 863; Timmer v. Gray, 395 N.W.2d 477, 478 (Minn.App.1986); Anderson v. DeLisle, 352 N.W.2d 794, 796 (Minn.App.1984). Nothing in these Minnesota cases requires that all elements of a cause of action for fraud must be proved in order to use fraud as a stepping stone for quantum meruit. However, we begin with the elements of a cause of action for fraud under Minnesota law as a useful guide. See Davis v. Re-Trac Mfg. Corp., 149 N.W.2d 37, 38-39 (Minn.1967) (listing elements of cause of action for fraud). Titan argues that the evidence was insufficient to support the necessary findings of materiality, inducement, justifiable reliance, causation and damages. We disagree. Both Ventura's and Bloom's testimony support the district court's findings. The district court found their testimony to be credible, and we must give deference to the district court's credibility determinations. Fed.R.Civ.P. 52(a) ("due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses").
 
 
 25
 The evidence demonstrates that in 1987, Ventura hired Bloom to negotiate with Titan on his behalf. During negotiations, Glover told Bloom that Titan's policy was to pay royalties only to talent featured in their own videotapes, such as the "Best of" videotapes. Believing it difficult to break Titan's policy, Bloom negotiated an agreement under which Ventura agreed to perform for Titan as a commentator. The agreement did not entitle Ventura to royalties for videotapes of his performances, unless he was the featured performer. Ventura's compensation did not include any payment based on videotape sales.
 
 
 26
 Between 1987 and 1990, Glover and Bloom met annually, in person or by telephone, to negotiate Ventura's performance fees for each broadcast season, and occasionally for special performances. During each negotiation, Bloom asked Glover whether Titan had changed its policy regarding the payment of videotape royalties, and each time Glover reiterated that no talent received videotape royalties unless they were the featured performer on a videotape. Glover also told Ventura of this policy. Bloom and Ventura relied on Glover's statements concerning Titan's royalty policy, and understood that by entering into fee agreements they waived any right Ventura had to royalties. Despite these representations, Titan simultaneously made numerous royalty payments which were inconsistent with the purported policy of not paying royalties except to featured performers.[10]
 
 
 27
 In light of this evidence concerning Titan's representations and its history of royalty payments, the district court concluded that from 1987 through 1990, Titan's representations to Ventura that its policy was to pay videotape royalties only to featured performers were false. The district court also found that had Ventura known that Titan did not abide by its stated policy, he would not have accepted a deal which did not compensate him for the reproduction and sale of his performances on videotape. The court further found that Ventura justifiably relied on Titan's fraudulent misrepresentations of its royalty policy, and as a result Ventura suffered damages. Thus, the district court rescinded the 1987-1990 agreements, and permitted Ventura to recover in quantum meruit. In light of the abundance of supporting evidence, we find no basis for concluding the district court's findings were clearly erroneous or lacked sufficient evidentiary support.
 
 
 28
 C. Did the district court abuse its discretion when it relied upon the testimony of Ventura's damages expert?
 
 
 29
 Titan makes two challenges to the testimony of Ventura's damages expert, Weston Anson. First, Titan argues that the district court abused its discretion when it admitted Anson's testimony that was "without foundation, speculative and irrelevant." Titan also argues that the district court "ignored all of the reliable, relevant evidence." Although not specifically so labeled by Titan, we interpret this second argument as a challenge to the sufficiency of the evidence relating to damages.
 
 
 30
 Our analysis of the admissibility of expert testimony concerning reasonable royalty rates is controlled by Federal Rules of Evidence 702 and 703. These rules require that evidence of "scientific knowledge" provided by an expert must be relevant and reliable. See Daubert v. Merrell Dow, --- U.S. ----, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Sorensen by and through Dunbar v. Shaklee Corp., 31 F.3d 638, 647 n. 13, 648 (8th Cir.1994). Titan's challenge to the admissibility of Anson's testimony is two-pronged. First, Titan argues that the testimony, which had to do with the market rate for royalties for licensing intellectual property, was irrelevant to the damages issue at trial. Second, in what appears to be a reliability-based challenge, Titan argues that the testimony was impermissibly speculative. We review the district court's decision to admit expert testimony for abuse of discretion. TCBY Sys., Inc. v. RSP Co., 33 F.3d 925, 929 (8th Cir.1994).
 
 
 31
 We believe that the district court did not abuse its discretion when it found Anson's testimony to be relevant. The relevance inquiry under Rule 401 merges the common law requirements of relevancy and materiality. See Fed.R.Evid. 401 advisory committee's note. Anson's testimony is relevant if it makes any material fact more likely than the fact would be in the absence of his testimony. See 22 Charles A. Wright & Kenneth W. Graham, Federal Practice and Procedure Sec. 5165, at 48 (1982 & Supp.1994).
 
 
 32
 Anson's testimony concerned a material fact. Minnesota cases generally state the amount of recovery in quantum meruit as the reasonable value of the benefit (or services) to the defendant. See, e.g., Sagl, 52 N.W.2d at 725; Frankson, 394 N.W.2d at 140; Galante, 379 N.W.2d at 726 ("value of the services rendered less benefits received"). Section 152 of the Restatement of Restitution, which applies in cases of conscious torts, defines the measure of recovery as the market value of the plaintiff's services irrespective of their benefit to the recipient. Restatement of Restitution Sec. 152, at 606 (1937). Thus, regardless of whether Titan's actions rise to the level of a conscious tort, Anson's testimony concerning the market value of Ventura's videotape license relates to material facts: the value of the license to Titan (the measure of recovery for nonconscious torts) and the value of royalties to Ventura (the measure of recovery for conscious torts).
 
 
 33
 Anson's testimony is relevant because it tended to fix the value of the license/royalty. By providing evidence of the market rate for videotape royalties, Anson's testimony (1) provided direct evidence of the market value of Ventura's license, which is the measure of Ventura's recovery if Titan's conduct was consciously tortious; and (2) assisted the jury in determining the reasonable amount that Ventura's license is worth to Titan by providing the competitive background against which Titan is operating. Titan argues that Anson's testimony is irrelevant because Glover and Bloom negotiated an arm's length deal that should be used as the measure of royalties and, alternatively, because Titan's policy which provides for a royalty rate of less than five percent should be used to determine the amount of the royalty. We reject these arguments. The proof identified by Titan simply provides evidence of a reasonable royalty rate; it does not render competing evidence irrelevant. Accordingly, we conclude that the district court did not abuse its discretion when it concluded that Anson's testimony was relevant.
 
 
 34
 We now turn to the related question whether Anson's testimony was reliable. Titan argues that Anson's testimony is unreliable because it is impermissibly speculative. In order to assess whether Anson's testimony is reliable, we must focus on the methodology and principles underlying the testimony, not the conclusions they generate. Sorensen, 31 F.3d at 648. Anson arrived at his estimate of damages by applying a royalty percentage to Titan's revenues from wholesale distribution of the tapes. The sales figures for the ninety videotapes upon which Ventura appeared were not available, but net profits (a more conservative measure) were established to the penny ($25,733,527.94). The main dispute concerns the royalty rate applied to this figure to generate the royalty that is the measure of damages. Titan's expert figured damages in a similar fashion, applying varying royalty percentages and formulas to base amounts keyed to sales. Anson testified that a five percent royalty was the minimum that he would be satisfied with as an agent and was the single most likely rate, but that rates could range from 3.5% to 7.5%. When applied to the profits figure, these rates yield: $865,723.00 (3.5%), $1,236,747.00 (5%), and $1,855,121.00 (7.5%).
 
 
 35
 We believe that Anson's methodology in arriving at the royalty percentages was reliable. Anson based his opinion as to the reasonable royalty upon a survey of thousands of licensing agreements. It is common practice to prove the value of an article (e.g., a videotape license) by introducing evidence of transactions involving other "substantially similar" articles (i.e., other licenses). 2 John H. Wigmore, Wigmore on Evidence Sec. 463, at 616-30 (James H. Chadbourn rev. 1979). Anson surveyed licensing agreements involving numerous sports and entertainment figures, App. at 487a (NFL), 489a (major league baseball), as well as various other types of characters. Although no individual arrangement examined by Anson was "on all fours" with the predicted Ventura-Titan license, in the aggregate, the licenses provided sufficient information to allow Anson to predict a royalty range for a wrestling license. We believe that this methodology is sufficiently reliable to support the admission of Anson's testimony.
 
 
 36
 Titan's other arguments go mostly to Anson's qualifications as an expert. Anson's qualifications are quite impressive, and certainly more so than those of some experts whose testimony this court has permitted. Compare App. at 463-69 (detailing Anson's undergraduate and graduate education and work experience) with Bennett v. Lockhart, 39 F.3d 848, 856-57 (8th Cir.1994) (affirming admission of testimony of deputy sheriff as expert concerning the likely effect of jumping from height of 25 feet into 5 feet of water), cert. denied, --- U.S. ----, 115 S.Ct. 1363, 131 L.Ed.2d 219 (1995). Titan's arguments boil down to an argument that Anson cannot be qualified and his methodology cannot be trusted because he did not personally handle Ventura's licenses. This argument is meritless. Accordingly, we find no abuse of discretion in the district court's admission of Anson's testimony. We also find no merit to Titan's challenge to the sufficiency of the evidence to support the damages award.
 
 
 37
 D. Did the district court clearly err when it denied Ventura's request for prefiling interest?
 
 
 38
 On appeal, the parties agree upon the interpretation of Minnesota law. Under the interpretation adopted by the district court, prefiling interest may be awarded under Minnesota law if the claim was liquidated or readily ascertainable by reference to objective standards. Northwest Airlines, Inc. v. Flight Trails, 3 F.3d 292, 297 (8th Cir.1993) (citing Potter v. Hartzell Propeller, Inc., 291 Minn. 513, 189 N.W.2d 499 (1971)). The district court's determination that Ventura's claim was not readily ascertainable is a factual finding reviewed for clear error. Northwest Airlines, 3 F.3d at 298.[11] Prejudgment interest has been denied where ambiguities in a commission agreement included the length of the required period preceding notice of termination, the exact sales base for the commission and the commission rate (5% vs. 7%). Bitronics Sales Co. v. Microsemiconductor Corp., 610 F.Supp. 550, 555 (D.Minn.1985) (Murphy, J.).
 
 
 39
 Although in this case the ultimate award of damages was made by reference to objective standards (market value), there are sufficient questions to prevent it from being "readily ascertainable," thereby precluding an award of prejudgment interest. Anson's testimony established that although 5% was the most likely rate, the potential royalty rate varied between 3.5% and 7.5%. Moreover, as there was no agreement, certain payment details, such as the wholesale sales base, the categorization of tapes upon which Ventura appears in multiple roles and the time periods for accrual and payment of royalties, were also unsettled. Thus, this case presents ambiguities similar to those encountered in Bitronics. The precise royalty rate and payment details were contingencies that the jury was required to resolve. Minnesota law precludes an award of prefiling interest where the factfinder must resolve such contingencies. Hutchinson Util. Comm'n v. Curtiss-Wright Corp., 775 F.2d 231, 242 (8th Cir.1985); Unique Sys., Inc. v. Zotos Int'l, Inc., 622 F.2d 373, 379-80 (8th Cir.1980).[12]
 
 
 40
 Minnesota cases have also found that 200% variations in damages from low to high estimate preclude an award of prefiling interest. Potter, 189 N.W.2d at 504 (no prefiling interest where range of $45,000 to $95,000); Hogs Unlimited v. Farm Bureau Mut. Ins. Co., 401 N.W.2d 381, 387 (Minn.1987) (no prefiling interest where range of $218,500 to $428,250).[13] Cases in which prefiling interest is awarded involve much less extreme variations. See, e.g., Pearson-Berke, Inc. v. McIntosh, 350 N.W.2d 378 (Minn.1984) (interest awarded where recovery varied between $4,822.50 and $6858); Polaris Indus. v. Plastics, Inc., 299 N.W.2d 414 (Minn.1980) (denial of prefiling interest on $66,758.31 of $208,391.98 verdict reversed where "[w]ith the exception of about $21,000 ... the jury's award reflected item by item the exact amount of out-of-pocket expenses"). Accordingly, we find that the district court did not commit clear error in denying prefiling interest where Ventura's damages estimates varied by over 200% ($865,723 to $1,855,121).
 
 III. CONCLUSION
 
 41
 The district court did not clearly err when it determined that Ventura's pre-Bloom contracts did not address videotape licensing and royalties. Accordingly, it did not err in permitting quantum meruit recovery of videotape royalties for the pre-Bloom period. Nor did the district court err when it awarded quantum meruit recovery for the post-Bloom period. We also find that the district court did not abuse its discretion in qualifying Anson, nor did it abuse its discretion in determining that Anson's testimony was relevant and that the methods used by Anson were reliable. We further find that the district court did not clearly err in denying Ventura's request for prefiling interest where Ventura's potential damages varied by over 200% and where the amount was contingent upon the factfinder's determination of unresolved issues.
 
 
 42
 MORRIS SHEPPARD ARNOLD, Circuit Judge, dissenting.
 
 
 43
 I dissent from so much of the court's opinion as allows Mr. Ventura a recovery for royalties before Mr. Bloom negotiated a contract for him. To state a cause of action for unjust enrichment in Minnesota, a plaintiff must show either on legal or equitable grounds, or based on principles of natural justice, that a defendant's retention of a benefit would be unjust. Mehl v. Norton, 201 Minn. 203, 205-07, 275 N.W. 843, 844-45 (1937). In the court's view, Mr. Ventura was deprived of a legal right to additional compensation because Titan infringed his right of publicity. I believe that the court has mistakenly allowed this recovery, however, because I do not think that a right of publicity exists under Minnesota law.
 
 
 44
 The court finds a right of publicity under Minnesota law in the absence of any evidence that Minnesota's courts would welcome this cause of action--and, indeed, a Minnesota Supreme Court case indicates to me that they would not. Minnesota has not adopted the tort of appropriation of name or likeness or any of the other torts collectively known as invasion of privacy, Hendry v. Conner, 303 Minn. 317, 319, 226 N.W.2d 921, 922-23 (Minn.1975), and a right to one's likeness is virtually indistinguishable from a right of publicity. See Carson v. Here's Johnny Portable Toilets, Inc., 698 F.2d 831, 834 (6th Cir.1983). With respect, the two federal cases that the court relies on offer no significant support for its conclusion. Uhlaender v. Henricksen, 316 F.Supp. 1277, 1279-80 (D.Minn.1970), was decided before Hendry, and McFarland v. E & K Corp., 18 U.S.P.Q.2d (BNA) 1246, 1991 WL 13728 (D.Minn.1991), cites no Minnesota state cases whatever for the existence of a right of publicity. It is also not irrelevant that a majority of states do not recognize a cause of action based on a right of publicity, Donald S. Chisum and Michael A. Jacobs, Understanding Intellectual Property Law 6-67 (1992), and it appears that most states that have adopted one have done so by statute. See id. at nn. 2 & 3. Finally, it is highly significant that, in the year 1995, when everyone not only wants his or her fifteen minutes of fame but the concomitant television rights as well, no Minnesota state court has yet discovered a right of publicity in Minnesota law. The court has thus cited no "reliable data," B.B. v. Continental Ins. Co., 8 F.3d 1288, 1291 (8th Cir.1993), to indicate that Minnesota would recognize such a right. Titan was therefore not enriched in violation of a legal right recognized in Minnesota.
 
 
 45
 Nor has Mr. Ventura shown that it would be inequitable or violate natural justice for Titan to reproduce and sell the videotapes that it produced and on which Mr. Ventura was already paid to appear as an announcer without paying him additional consideration. The doctrine of unjust enrichment, it is true, may provide recovery for performing extra services not specified in an original contract, Sagl v. Hirt, 236 Minn. 281, 287, 52 N.W.2d 721, 725 (1952), but Mr. Ventura does not argue that he performed any duties in addition to his commentary. One may also recover to prevent unjust enrichment if a benefit is conferred "unknowingly" or "unwillingly," Galante v. Oz, Inc., 379 N.W.2d 723, 726 (Minn.App.1986), but Mr. Ventura's own testimony shows that he did not confer the alleged benefit unknowingly or unwillingly. More important, it is hardly unjust, from an economic viewpoint, that Titan should receive the full benefit from selling copies of the videotapes that it created. Titan, as entrepreneur, staged the wrestling matches, hired the various wrestlers, hired the announcers, and, above all, took the risks that the venture would fail to turn a profit. Now that Titan has been successful, Mr. Ventura wants additional compensation for having performed no additional work. If there is any unjust enrichment in this case, it is in allowing Mr. Ventura a recovery under these circumstances.
 
 
 46
 Plaintiff cites Frankson v. Design Space Int'l, 394 N.W.2d 140, 145 (Minn.1986), and Holman v. CPT Corp., 457 N.W.2d 740, 745 (Minn.App.1990), for the proposition that when there is a lack of full agreement concerning compensation an employee may still recover in quantum meruit. That is no doubt so. But those cases are inapposite because each involved performances that had concededly not been compensated. The issue in each was whether sales employees would be allowed to recover commissions. In Frankson, the court held that the parties never reached an agreement about commissions and that therefore the plaintiff should be allowed a quantum meruit recovery. In Holman, plaintiff was terminated before she realized a commission on a sale that was virtually complete but still pending when she was fired, and the contract was silent with respect to whether a commission was due under the circumstances. Mr. Ventura, by contrast, performed and was compensated for his performances. He made an agreement to be paid a weekly sum rather than royalties for announcing wrestling events, and while he now regrets this less favorable arrangement, his regrets are not actionable under Minnesota law because one cannot recover for an unfavorable bargain. See Galante, 379 N.W.2d at 726.
 
 
 47
 Nelson v. Radio Corp. of Am., 148 F.Supp. 1 (S.D.Fla.1957) is an instructive case. Nelson, a vocalist, was hired to perform with the Glenn Miller Orchestra. Miller paid him weekly according to union scale. Nelson sang six selections for a recording session and two more for a broadcast that also was recorded. Miller assigned all his rights in the records to the defendant, and in due course, defendant made copies of the recordings for sale. Nelson sued for an accounting for the sale of the recordings on which he sang, a 5 percent royalty on the records, as well as injunctive relief and damages. The evidence established that Nelson had no agreement with Miller entitling him to receive any royalties on the sale of photograph records. The court ruled that "any right in and to phonograph records or other recordings in connection with the production of which plaintiff worked were the property of the plaintiff's employer Miller...." 148 F.Supp. at 3. The court therefore rejected Nelson's claim for royalties.
 
 
 48
 The reasoning of Nelson is highly persuasive and our case is strikingly similar to it. Mr. Ventura agreed to receive weekly pay to perform wrestling commentary. He does not dispute, as far as I can discern, that the videotapes belong to Titan. Mr. Ventura, like Nelson, is suing for a royalty on the sales of the recordings on which he performed. And like Nelson, Mr. Ventura deserves no recovery because he and Titan both performed under their contract and the recordings of Mr. Ventura's performances now belong to Titan and it may profit from them as it sees fit.
 
 
 49
 Finally, even if Minnesota recognized a cause of action for the breach of a right of publicity, and even if this case could be properly characterized, as the court seems to believe, as a dispute over the scope of a license of intellectual property rights (that is, publicity rights), I still doubt that Mr. Ventura should recover. Mr. Ventura himself testified that he was employed to "broadcast wrestling." The agreement was therefore clearly susceptible to the construction that it authorized the sale of videotapes to end users. According to a leading copyright treatise, the preferred rule for copyright contracts when the intent of the parties is unclear is that the licensee may properly pursue any uses that may reasonably be said to fall within the medium as described in the license. 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright Sec. 10.10[B] at 10-93 (1993). It follows "that a grant of the right to exhibit a motion picture by 'television' in its unambiguous core meaning refers to over-the-air television broadcasts, but in its ambiguous penumbra includes any device by which the motion picture may be seen on television screens, including cable television and videocassette uses." Id. at 10-94. The ambiguity ought to favor the licensee because "it is surely more arbitrary and unjust to put the onus on the licensee by holding that he should have obtained a further clarification of a meaning that was already present than it is to hold that the licensor should have negated a meaning that the licensee might then or thereafter rely upon." Id. I believe that this principle is recommended by reason and is applicable here because a right of publicity does not differ in any material way from a copyright. See Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n, 805 F.2d 663, 679 (7th Cir.1986), cert. denied, 480 U.S. 941, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987). Mr. Ventura testified that he was hired to perform commentary for television broadcasts. "Television broadcasts" under these circumstances must reasonably include dissemination of the videotapes containing the commentary that Mr. Ventura performed as part of his employment. Indeed, this seems to me utterly implicit in the original contractual arrangement.
 
 
 50
 For the foregoing reasons, I believe that Mr. Ventura's claim for additional compensation for his announcing duties in the period before Mr. Bloom negotiated a contract for him fails as a matter of law. I would therefore reverse that part of the judgment allowing Mr. Ventura's recovery for his role as a commentator before he entered into the written contract.
 
 
 
 [1]
 We refer to the contracts negotiated by Ventura's agent, Barry Bloom, during the 1987-90 period as "post-Bloom" contracts. The earlier oral agreements between Ventura and McMahon we refer to as the "pre-Bloom" contracts
 
 
 [2]
 A color commentator provides the story of the wrestling match, which is in essence a stage show. A heel commentator is a color commentator who plays the role of "the bad guy."
 
 
 [3]
 The fraud pleaded in Ventura's Complaint and Second Amended Complaint is that Titan fraudulently misrepresented to Ventura that Ventura was employed for no purpose other than a live performance. Second Amended Complaint p 42
 
 
 [4]
 For the sake of simplicity, we discuss the issues only in terms of the videotapes. However, the principles applied to videotape licenses and royalties apply equally to other merchandise
 
 
 [5]
 We are aware that the district court excluded all evidence "relevant solely to [Ventura's] appropriation claim." Order at 4 (Feb. 2, 1994). Contrary to Titan's assertions, the law of the case doctrine does not preclude our review of this issue in the context of Ventura's quantum meruit claim. See 2A Federal Procedure: Lawyers Edition Sec. 3:705, at 361 (1994). Moreover, the district court implicitly resolved this issue in Ventura's favor by awarding restitution under quantum meruit
 
 
 [6]
 We are troubled by the fact that section 301(a) of the copyright code (Title 17) preempts Ventura's claims that are "equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106," such as the production of videotapes of Ventura's televised commentary. Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n, 805 F.2d 663, 675 (7th Cir.1986) (baseball players' challenge to television broadcast of live games without their consent as a violation of their publicity rights preempted), cert. denied, 480 U.S. 941, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987). However, Titan has not timely raised the issue of preemption on appeal, and has therefore waived it. See, e.g., United States v. Eldeeb, 20 F.3d 841, 843 (8th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 269, 130 L.Ed.2d 187 (1994). We deny Titan's motion for leave to file a supplemental brief addressing these waived issues
 
 
 [7]
 A corollary of this rule is that quantum meruit is available if the benefit is conferred unknowingly, but not if the benefit is conferred merely as part of a bad bargain. Galante v. Oz, Inc., 379 N.W.2d 723, 726 (Minn.App.1986). For the reasons discussed below, we conclude that Ventura conferred the videotape rights upon Titan unknowingly
 
 
 [8]
 Ventura stated that he was aware that tapes were being distributed in 1985. App. at 99-100
 
 
 [9]
 In Stark, the plaintiff's right to rescind and seek quantum meruit was based upon the defendant's breach of contract. In the present case, Ventura's right to rescind and seek quantum meruit is premised upon Titan's fraud. However, this factual difference is immaterial
 
 
 [10]
 In 1985, 1986 and 1987, Titan paid videotape royalties to Hulk Hogan and Marvel Comics for "Wrestlemania I," "II" and "III," despite the fact that there was no featured performer in these productions. During 1988, Titan paid videotape royalties to all 54 wrestlers appearing in the "Survivor Series," to all 57 wrestlers appearing in "Wrestlemania IV" and to all 38 wrestlers appearing in "Summer Slam '88." Again, these payments were inconsistent with Titan's stated policy because none of these videotapes had one featured performer. Beginning in December 1988, Titan paid royalties to all wrestlers appearing in videotapes of pay-per-view events
 
 
 [11]
 We are aware that several Minnesota cases predating Northwest Airlines state that the standard of review is de novo. However, we are bound to follow Eighth Circuit precedent. We note that our resolution of this issue would be no different were we to review the matter de novo
 
 
 [12]
 International Financial Services v. Franz, 515 N.W.2d 379 (Minn.App.1994), aff'd and rev'd, 534 N.W.2d 261 (Minn.1995), is not to the contrary. In IFS, an award of prefiling interest was affirmed where a jury awarded $216,000 in damages as the difference between the value of a photo-plotting machine as warranted and as delivered. IFS contains no discussion of any range of damages estimates, but it is not unlikely that the estimates of the value of a photo-plotting machine were more consistent and less contingent (and hence more readily ascertainable) than those involved here
 
 
 [13]
 Lacey v. Duluth, Missabe & Iron Range Ry., 236 Minn. 104, 51 N.W.2d 831 (1952), upon which Ventura relies, is consistent with this analysis. In Lacey, an award of prefiling interest was affirmed where the amount in dispute ranged from approximately $4750 to $9300. The Lacey court affirmed an award of prefiling interest, noting that the amount ultimately awarded ($7,127.03) did not differ from the amount requested ($9,307.17) by an "unreasonable" amount. Lacey focused upon the difference between the high end of the damages range and the amount awarded rather than the range of damages estimates. In Lacey, the award-estimate difference found to be reasonable was less than 25% of the amount of the requested amount. In the instant case, the difference is several times that amount, and may easily be viewed as "unreasonable" as that term was used in Lacey